PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 09-3790
_____

EUROFINS PHARMA US HOLDINGS; VIRALLIANCE
INC.,
                                       Appellants

v.

BIOALLIANCE PHARMA SA; VIRALLIANCE SAS;
GILLES AVENARD

_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT
FOR THE DISTRICT OF DELAWARE
(D.C. Civ. Action No. 08-613)
District Judge: Honorable Gregory M. Sleet

_____

Argued: July 13, 2010
_____

Before: RENDELL, JORDAN, and GREENAWAY, JR.,
Circuit Judges

(Opinion Filed: October 12, 2010)

_____

Daniel P. Goldberg (argued)
Dorit Ungar
Kristina R. Juntunen
Kasowitz, Benson, Torres, & Friedman, LLP
New York, New York 10019
     *Counsel for Appellants*

Joel Friedlander (argued)
Sean M. Brennecke
Bouchard Margules & Friedlander
222 Delaware Avenue, Suite 1400
Wilmington, Delaware 19801
     *Counsel for Appellees*

_____

OPINION

_____


GREENAWAY, JR., Circuit Judge

     Appellants Eurofins Pharma US Holdings and Viralliance Inc. appeal the dismissal of their complaint by the United States District Court for the District of Delaware, which held that it lacked personal jurisdiction over the appellees, BioAlliance

2

Pharma SA, Viralliance SAS, and Gilles Avenard, and also dismissed the action under the doctrine of *forum non conveniens*. For the reasons that follow, we will affirm the District Court's ruling that it lacks personal jurisdiction over BioAlliance Pharma SA and Viralliance SAS, vacate the District Court's order that it lacks personal jurisdiction over Gilles Avenard, and affirm the District Court's dismissal of the action under *forum non conveniens*.

## I. BACKGROUND

This dispute arises out of the acquisition by appellants Eurofins Pharma US Holdings ("EPUSH") and Viralliance Inc. ("VI") (collectively, "Eurofins Group") of intellectual property (the "IP") from BioAlliance Pharma SA ("BioAlliance") and Viralliance SAS ("Viralliance") (collectively, "BioAlliance Group"). The IP includes, among other things, *in vitro* phenotyping technology, known as assays, that assist in the development and administration of drugs used to treat HIV and Hepatitis B by testing the effectiveness of those drugs on specific patients' viruses. In 2005, Eurofins Group and BioAlliance Group entered into an agreement (the "Transfer Agreement") to transfer the IP from BioAlliance Group to VI, for the purpose of commercializing the IP in the United States market.

The gravamen of Eurofins Group's complaint is that, despite BioAlliance Group's contractual promise that no claims were pending or threatened against it regarding the use of the IP, BioAlliance Group knew about a patent infringement claim threatened against the IP by Advanced Biological Laboratories, S.A. ("ABL"); that Gilles Avenard—a director of VI, the co-founder and chief operating officer of BioAlliance, and the

3

former president and chief executive of Viralliance—failed to inform the other VI board members of the threatened claim; and that BioAlliance Group wrongly asserts that it continues to own the IP.

## A. The Parties

EPUSH is a holding company incorporated in Delaware with its principal place of business in Des Moines, Iowa. Eurofins Scientific, Inc. ("Eurofins Scientific"), an affiliate of EPUSH, is a Delaware corporation with its principal place of business in Des Moines, Iowa. (EPUSH and Eurofins Scientific will be collectively referred to as "Eurofins.") VI, a corporation formed under the laws of Delaware with its principal place of business in Des Moines, Iowa, was created by, and is a wholly-owned subsidiary of, Eurofins.[1] VI is the acquirer, via the Transfer Agreement, of the IP at the heart of this litigation.

BioAlliance, a société anonyme[2] formed under the laws of France, with its principal place of business in France, is a pharmaceutical company focused on the treatment of opportunistic infections in cancer and HIV. Viralliance was a simplified société anonyme and wholly-owned subsidiary of BioAlliance, formed under the laws of France, which was

---

[1] VI was formerly known as Eurofins Viralliance, Inc., and is referred to as "EVI" in the Transfer Agreement and several court documents. For the purpose of clarity, all references to EVI are changed to VI in this opinion.

[2] "Société anonyme" is the French term used to designate a corporation.

4

engaged in the development and commercialization of products and services to assess viral and cancer drug resistance. Avenard, a director of VI and the co-founder and chief executive officer of BioAlliance, is a citizen of France. He was also the president and chief executive officer of Viralliance.

## B. The Transfer Agreement

The Transfer Agreement was executed on October 20, 2005, and the transaction, pursuant to the Transfer Agreement, closed on December 15, 2005. The parties agree that the majority, if not the entirety, of the Transfer Agreement negotiations took place in France. Of the individuals involved in the Transfer Agreement negotiations, only Jonathan Lapin, a New York lawyer who assisted Eurofins Group, was not domiciled in Europe.[3]

The Transfer Agreement provided that Eurofins formed VI as its wholly owned subsidiary and that it (Eurofins) would fund VI with up to $4 million. In exchange, BioAlliance Group would transfer the IP to VI for ten dollars and the future right to purchase stock options in VI (the "Option"). (App. at 59-60.) In addition, the Transfer Agreement provided that Eurofins would elect one person nominated by BioAlliance to VI's board of directors while BioAlliance Group's Option remained outstanding. (App. at 65.)

The Transfer Agreement states that, to the best of BioAlliance Group's knowledge, "the IP is valid and enforceable and the current use by BioAlliance Group or its licensees or sub-

_____

[3] Lapin also incorporated VI in Delaware.

licensees [] neither infringes on the rights of any third party nor constitutes an unauthorized use," (App. at 63), and that "there is no fact which could have a material adverse effect on either of []VI or the IP which has not previously been disclosed in writing by [BioAlliance Group]." (App. at 62.)

The transfer from BioAlliance Group to VI of the IP included the transfer of BioAlliance Group's right, title, and interest in and to all agreements, including licenses, relating to the IP. (App. at 60.) Prior to the Transfer Agreement, BioAlliance Group had licensed patents that comprise part of the IP to Specialty Laboratories, Inc. ("Specialty Labs"). The licensing agreement between BioAlliance Group and Specialty Labs contained a non-infringement representation and warranty, as well as an indemnification obligation by BioAlliance Group, in favor of Specialty Labs. Eurofins Group assumed the indemnification obligation under the Transfer Agreement.

The Transfer Agreement "embod[ied] the entire agreement of the parties with respect to the subject matter hereof" and provided that the agreement "shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflicts of law rules of such State." (App. at 67.) It did not, however, contain a forum selection clause.[4]

## C. ABL's Claim Against The IP

---

[4] The parties agreed that there would be no forum selection clause, which resulted from their inability to decide on a mutually acceptable forum.

6

On or about July 15 and August 23, 2006, ABL contacted Specialty Labs to claim that its use of certain phenotyping technology, licensed to it by BioAlliance Group, infringed two ABL patents—U.S. Patent Numbers 6,081,786 and 6,188,988. On January 27, 2007, ABL sued AmeriPath, Inc., the corporate parent of Specialty Labs, for patent infringement.[5] VI stepped in to defend the action, pursuant to its contractual obligation to indemnify Specialty Labs. After six months of negotiations, the parties settled the lawsuit. Under the settlement, ABL granted VI a non-exclusive license to use patents 6,081,786 and 6,188,988, in consideration for a one-time payment and royalties.

The crux of the instant litigation is Eurofins Group's allegation that it learned for the first time during the settlement negotiations that ABL, in early 2005, had informed BioAlliance Group that it (BioAlliance Group) required a license from ABL, with respect to the phenotyping technology. ABL had been in negotiations with BioAlliance Group to purchase Viralliance's assets prior to Eurofins Group's involvement. ABL also allegedly informed Eurofins Group that, in early 2005, ABL engaged the services of La Societe Bionest Partners ("Bionest") to advise BioAlliance Group that it required a license from ABL with respect to the phenotyping technology. Eurofins Group alleges that Bionest has at least one piece of written

_____

[5] Eurofins Group did not attach as an exhibit to the complaint the ABL Settlement License because the complaint is subject to confidentiality restrictions that require ABL's consent prior to disclosure. Eurofins Group, however, has declared that it seeks to submit a copy of the ABL Settlement License during this litigation.

7

correspondence reflecting the infringement claim it articulated on behalf of ABL to BioAlliance Group in late 2004 or early 2005. Eurofins Group has, as yet, been unable to procure this document due to confidentiality obligations asserted by BioAlliance Group.[6]

At a July 22, 2008, meeting of the VI Board of Directors, Avenard confirmed that BioAlliance knew about the ABL claim in 2005, and that BioAlliance refused to consent to the release of the Bionest correspondence. The minutes of that meeting provide:

> The fifth order of business was a discussion of [BioAlliance's] reasons for refusing to consent to the disclosure by Bionest of its dossier relating to efforts of Bionest (on behalf of [ABL]) to acquire the Viralliance business from [BioAlliance] in 2005. . . . Mr. Avenard explained that [BioAlliance's] consent to Bionest's disclosure request was withheld because the Bionest dossier contains confidential and sensitive strategic information relating to [BioAlliance's] efforts to sell the Viralliance business and not relevant to VI. Mr. Avenard went on to say that, as a

---

[6] ABL has agreed to produce the document to Eurofins Group, provided that BioAlliance Group consents to the disclosure. Thus far, BioAlliance Group has refused to give its consent.

8

negotiating tactic in 2005, Mr. Sayada[7] alleged that the Viralliance business infringed on ABL patents (in order to justify making a lower offer for the Viralliance assets) and that, at the time, BioAlliance had obtained legal opinions (which BioAlliance had but would not make available) that there was no infringement.

(App. at 131.)[8]

---

[7] Sayada was an ABL executive in 2005, at the time that it was negotiating with BioAlliance.

[8] Avenard refused to sign the minutes for that meeting. Instead, he circulated a revised version of the minutes, which provided:

> Mr. Avenard explained that [BioAlliance's] consent to Bionest's disclosure request was withheld because the Bionest dossier contains confidential and sensitive elements of business negotiation[s] relating to [BioAlliance's] effort to sell the Viralliance business and not relevant to VI, which was acknowledged by Jonathan Lapin. Mr. Avenard went on to say that things were very clear with ABL patents and that they had nothing to do with Viralliance system. It appeared that, in 2005, as a negotiating tactic, Mr. Sayada proposed a license on a complementary technology in order to enlarge the business perspectives, in the unique objective to justify making  a lower offer for the

9

In connection with the Transfer Agreement, Eurofins Group and BioAlliance Group also entered into a Technical Assistance and Research Agreement ("TARA"). Pursuant to the TARA, BioAlliance Group was given a license to the IP in order to develop it for VI's benefit. VI would own any of the technology that was developed in accordance with the TARA and was obligated to reimburse BioAlliance Group for research-related expenses. The instant litigation also concerns a dispute over certain technology developed by BioAlliance Group that VI claims ownership over, pursuant to the TARA.

## D. The Litigation

On September 23, 2008, Eurofins Group sued BioAlliance Group and Avenard in the United States District Court for the District of Delaware.[9] On October 28, 2008, BioAlliance Group and Avenard moved to dismiss the complaint. On January 29, 2009, BioAlliance filed suit against Eurofins Group and ABL in

---

Viralliance assets.

(App. at 144.)

[9] The complaint stated eight causes of action: (1) fraudulent inducement against BioAlliance Group, seeking rescission; (2) fraudulent inducement against BioAlliance Group, seeking damages; (3) equitable fraud against BioAlliance Group; (4) breach of contract against BioAlliance Group; (5) breach of fiduciary duties against Avenard; (6) declaratory judgment against BioAlliance Group; (7) infringement against BioAlliance Group; and (8) conversion against BioAlliance Group.

10

the Commercial Court in Paris, France. On March 11, 2009, BioAlliance Group and Avenard filed a motion to stay discovery in the Delaware action pending the outcome of their motion to dismiss.

On July 6, 2009, the District Court held a teleconference, pursuant to Federal Rule of Civil Procedure 16, to discuss the motions to dismiss and stay discovery. During the teleconference, the Court issued an oral order staying discovery in the case pending its ruling on the motion to dismiss: "in a *de facto* sort of way, I am going to [] grant[] the motion for [a] stay, though not formally." (App. at 426.)

On September 18, 2009, the District Court granted BioAlliance Group's and Avenard's motion to dismiss. Eurofins Pharma U.S. Holdings, Inc. v. Bioalliance Pharma SA, No. 08-613, 2009 WL 2992552 (D. Del. Sept. 18, 2009). Specifically, the Court held that the claims against BioAlliance Group and Avenard should be dismissed for lack of personal jurisdiction, and that the action should be dismissed under the doctrine of *forum non conveniens*. Id. at *3. Additionally, the Court denied Eurofins Group's request to take jurisdictional discovery. Id. at *3 n.4.

On February 17, 2010, Eurofins Group filed the instant appeal challenging each of the District Court's holdings.

## II. **JURISDICTION**

The District Court's jurisdiction was premised on 28 U.S.C. § 1332(a)(3). We have jurisdiction to hear this appeal under 28 U.S.C. § 1291.

## III. **ANALYSIS**

11

For the reasons addressed below, we will affirm the District Court's dismissal of the claims against BioAlliance Group for lack of personal jurisdiction and the District Court's denial of Eurofins Group's motion for jurisdictional discovery related to BioAlliance Group; we will vacate the District Court's dismissal of the claims against Avenard for lack of personal jurisdiction; and we will affirm the District Court's dismissal of the complaint on the ground of *forum non conveniens*.

**A. Personal Jurisdiction Over BioAlliance Group**

We review *de novo* the District Court's decision that it lacks personal jurisdiction. Telcordia Tech Inc. v. Telkom SA Ltd., 458 F.3d 172, 176 (3d Cir. 2006).

Under Federal Rule of Civil Procedure 4(e), a federal district court may assert personal jurisdiction over a nonresident of the state in which the court sits to the extent authorized by the law of that state. Whether a district court has personal jurisdiction over a nonresident defendant is a two-part inquiry. First, there must be a statutory basis for exercising jurisdiction over the nonresident defendant in accordance with the law of the forum state. Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 330 (3d Cir. 2009). Second, the nonresident must have minimum contacts with the forum state sufficient to satisfy constitutional due process. Id. Where the district court does not hold an evidentiary hearing, the plaintiff need only establish a prima facie case of personal jurisdiction. Id. (citing O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312, 316 (3d Cir. 2007)). Further, "[i]t is well established that in deciding a motion to dismiss for lack of [personal] jurisdiction, a court is required to accept the plaintiff's allegations as true, and is to construe disputed facts in favor of

12

the plaintiff." Id. (citing Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 457 (3d Cir. 2003)).

In pertinent part, the Delaware long-arm statute provides a statutory basis for the exercise of personal jurisdiction over any nonresident who transacts business or performs work in Delaware, contracts to supply services or things in Delaware, or causes tortious injury in Delaware by an act or omission in Delaware. Del. Code Ann. tit. 10, § 3104(c) (2010).[10] Section 3104(c) "is to be broadly construed to confer jurisdiction to the maximum extent possible under the Due Process Clause." Hercules Inc. v. Leu Trust & Banking (Bahamas) Ltd., 611 A.2d 476, 480-81 (Del. 1992).

Eurofins Group alleges that BioAlliance Group transacted

_____

[10] Specifically, the relevant text of § 3104 provides:

(c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:
> (1) Transacts any business or performs any character of work or service in the State;
> (2) Contracts to supply services or things in this State;
> (3) Causes tortious injury in the State by an act or omission of this State[.]

Del. Code Ann. tit. 10, § 3104.

13

business in Delaware, contracted to provide services in Delaware, and caused tortious injury in Delaware. Specifically, Eurofins Group asserts that the Transfer Agreement is based on a joint venture in which BioAlliance Group retains and asserts active control over VI. Further, Eurofins Group argues that the Transfer Agreement is premised on the incorporation of VI as a Delaware corporation. These arguments are not persuasive.

The terms of the Transfer Agreement do not indicate that VI is a joint venture or that BioAlliance Group retains any control over VI. To the contrary, the penultimate paragraph of the Transfer Agreement states:

> Notwithstanding anything to the contrary contained in this General Agreement or in any of the other Transaction Documents, no partnership, joint venture or other similar arrangement or relationship is being created or shall exist between BioAlliance Group, on the one hand, and []VI or Eurofins, on the other hand, under or with respect to the Transaction Documents.

(App. at 68.) The Transfer Agreement also states explicitly that "Eurofins wholly[] owns []VI." (App. at 58.)

In addition, the record lacks evidence that BioAlliance Group played any part in the decision to incorporate VI in Delaware. While the purpose of the Transfer Agreement was the commercialization of the IP in the United States, (App. at 59), there is no evidence in the record that BioAlliance Group had any intent that VI be incorporated in Delaware. The record is also bereft of evidence that BioAlliance Group engages in the management of VI.

14

Here, it is crucial to distinguish between Avenard, as an individual, and BioAlliance Group, as corporate entities. While Avenard, as a member of VI's board, does participate in the management of VI, he does so in his capacity as an individual. It makes no difference that he was nominated by BioAlliance (in France), nor that Eurofins was bound by the Transfer Agreement to appoint him. In other words, the relationship between Eurofins Group and BioAlliance Group is wholly contractual. As the District Court explained, being the foreign parent of a Delaware subsidiary, without more, is insufficient to confer personal jurisdiction over a nonresident defendant under the Delaware long-arm statute. Eurofins Pharma, 2009 WL 2992552, at * 4 (citing Monsanto Co. v. Syngenta Seeds, Inc., 443 F. Supp. 2d 636, 645 (D. Del. 2006)). It follows that BioAlliance Group's contractual right to select a board member—a lesser indicia of control than being the corporate parent of a Delaware subsidiary—is also insufficient, without more, to confer personal jurisdiction over BioAlliance Group.

Eurofins Group also avers that the parties intended that disputes concerning the Transfer Agreement be litigated in Delaware. To support its contention, Eurofins Group points to an ancillary contract, Schedule 9 to the Transfer Agreement, which contains a Delaware forum selection clause. (App. at 123-28.) This argument, too, is unavailing.

BioAlliance Group is not a party to Schedule 9. (App. at 128.) Additionally, Eurofins Group admits that the parties fought over a forum selection clause in the Transfer Agreement, but in the end they agreed to omit such a clause from the contract. As such, Schedule 9 does not represent the parties' intent to contest the issue of the proper forum in which to resolve disputes at a

15

later time.

Thus, even accepting Eurofins Group's allegations in the complaint as true, they fail to establish a prima facie case of personal jurisdiction. Metcalfe, 566 F.3d at 330. There is no indication that BioAlliance Group committed any act or omission in Delaware, either in connection with the Transfer Agreement or the TARA so as to permit jurisdiction to be asserted under subsections (c)(1) or (c)(3) of the Delaware long-arm statute. Del. Code. Ann. tit. 10, § 3104 (c)(1) (allowing for personal jurisdiction over a nonresident who "transacts any business or performs any character of work in [Delaware]"); id. at (c)(3) (allowing for personal jurisdiction over a nonresident who "[c]auses tortious injury in the State by an act or omission in [Delaware]"); see also TriStrata Tech., Inc. v. Neoteric Cosmetics, Inc., 961 F. Supp. 686 (D. Del. 1997) ("In order for a court to exercise jurisdiction under subsections (c)(1) and (c)(3), some act must actually occur in Delaware."). Furthermore, even if Eurofins Group had not waived its argument based upon subsection (c)(2) by failing to raise it before the District Court, which it has, Eurofins Group cannot establish that BioAlliance Group contracted to provide services in Delaware, since any services BioAlliance Group performed under the TARA were carried out in France. See Del. Code Ann. tit. 10, § 3104(c)(2) (allowing for personal jurisdiction over a nonresident who "[c]ontracts to supply services or things in [Delaware].").

Eurofins Group also appeals the denial of its request for jurisdictional discovery. We review the District Court's decision to deny jurisdictional discovery for abuse of discretion. Toys "R" Us, 318 F.3d at 455. "If the plaintiff presents factual

16

allegations that suggest 'with reasonable particularity' the possible existence of the requisite 'contacts between [the party] and the forum state,' the plaintiff's right to conduct jurisdictional discovery should be sustained." Id. (modification in original) (quoting Mellon Bank (E.) PSFS, Nat'l Ass'n v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992)). A plaintiff may not, however, undertake a fishing expedition based only upon bare allegations, under the guise of jurisdictional discovery. Belden Techs., Inc. v. LS Corp., 626 F. Supp. 2d 448, 459 (D. Del. 2009).

Eurofins Group falls woefully short of making factual allegations suggesting with "reasonable particularity" the possible existence of contacts between BioAlliance Group and Delaware. Eurofins Group argued that the "heavily lawyered" nature of the Transfer Agreement leads it to conclude that it is unlikely, if not impossible, that BioAlliance Group did not participate in the decision to incorporate VI in Delaware. That reasoning, however, militates against Eurofins Group's position because evidence of any such participation would be in Eurofins Group's possession and is not dispositive of the issue of whether jurisdictional discovery is required.

Thus, we affirm the District Court's denial of Eurofins Group's motion for jurisdictional discovery and the District Court's dismissal of the complaint against BioAlliance Group for lack of personal jurisdiction.

**B. Personal Jurisdiction Over Avenard**

Eurofins Group also appeals the District Court's dismissal of its complaint against Avenard for lack of personal jurisdiction. Specifically, Eurofins Group argues that the District Court erred in holding that it lacked personal jurisdiction over Avenard under

17

Del. Code Ann. tit. 10, § 3114(b) (2010).  We agree.

Section 3114(b) states that any nonresident of Delaware who accepts election as an officer of a Delaware corporation is deemed to have consented to service of process in any action in which that officer is a necessary or proper party, or in any action against that officer for any violation of his duties as an officer. "[I]t is the rights, duties, and obligations which have to do with service as a director of a Delaware corporation which make a director subject to personal service under the terms of" section 3114(b).  Hana Ranch, Inc. v. Lent, 424 A.2d 28, 30 (Del. Ch. 1980); see also Armstrong v. Pomerance, 423 A.2d 174, 176 n.5 (Del. 1980) (Section 3114(b) authorizes the exercise of jurisdiction "only in actions where directors . . . of a Delaware corporation are necessary or proper parties or where the cause of action is grounded on such individuals' breach of the fiduciary duties owed to a corporation and its owners.").  Thus, though Avenard moved to dismiss for lack of personal jurisdiction, whether the District Court has personal jurisdiction over Avenard is, pursuant to § 3114(b), actually a question of whether Eurofins Group has stated a claim against Avenard in his role as a director of VI upon which relief may be granted.

We review *de novo* a district court's decision to dismiss the complaint for failure to state a claim upon which relief may be granted. Dique v. New Jersey State Police, 603 F.3d 181, 188 (3d Cir. 2010).  "In deciding a motion to dismiss, all well-pleaded allegations of the complaint must be taken as true and interpreted in the light most favorable to the plaintiffs, and all inferences must be drawn in favor of them." McTernan v. City of York, 577 F.3d 521, 526 (3d Cir. 2009).  To withstand a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient

18

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, --- U.S. ----, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Eurofins Group alleges that Avenard, in his role as director of VI, breached his fiduciary duties by failing to notify VI of ABL's patent claim. According to Eurofins Group's complaint, "Mr. Avenard had knowledge of the ABL claim at all relevant times, including prior to execution of the Transfer Agreement." (App. at 49.) "Moreover, Mr. Avenard knew that under the Transfer Agreement, Eurofins Group assumed BioAlliance Group's obligation to indemnify, among others, Specialty Labs for any claims of infringement arising out of the IP." (App. at 50.) Avenard's silence therefore "protected BioAlliance Group's interest in avoiding its indemnity obligations to Specialty Labs, knowing all the while that ABL had asserted such a claim that BioAlliance Group otherwise would have been required to defend and suffer the disastrous financial consequences of that obligation." (App. at 50-51.)

The District Court concluded that the complaint failed to state a valid claim for breach of fiduciary duty against Avenard. Eurofins Pharma, 2009 WL 2992552, at *6. Specifically, the Court found that Eurofins Group failed to allege that Avenard personally engaged in any transactions that were either harmful to VI, or beneficial to him. Id. We disagree.

Under Delaware law, a director's fiduciary duty of loyalty includes a duty to disclose. Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC, 922 A.2d 1169, 1184 (Del. Ch. 2006). The duty to disclose "is not a general duty to disclose everything the director knows about transactions in which the corporation is involved." Id. Rather, it is "[t]he intentional failure or refusal of

19

a director to disclose to the board a defalcation or scheme to defraud the corporation of which he has learned, [which] itself constitutes a wrong." Hoover Indus., Inc. v. Chase, 1988 WL 73758, at *338 (Del. Ch. July 13, 1988) (quoted in Big Lots, 922 A.2d at 1184).

Big Lots cites several examples of cases in which courts held that a director violated his duty to disclose under Delaware law. Primary among those cases is Hollinger International v. Black, 844 A.2d 1022 (Del. Ch. 2004), the "paradigmatic example" of a director disclosure case, in which the controlling shareholder and director failed to disclose that he was "shopping" the company in violation of a signed contract that forbade such action. Big Lots, 922 A.2d at 1184 (citing Hollinger, 844 A.2d at 1061). Avenard attempts to distinguish the allegations in Eurofins Group's complaint from Hollinger and the other examples of director disclosure cases cited in Big Lots. Avenard is correct in distinguishing those cases, as the allegations in those cases do not mirror those made here. The dissimilarity does not, however, mandate that the complaint against Avenard be dismissed.

Instead, we read Big Lots more broadly than does Avenard. Whereas he argues that Big Lots provides the sum total of the types of director disclosure claims that will survive a motion to dismiss, we do not think the Big Lots court intended the examples of director disclosure claims it provides to be exhaustive. The complaint alleges that, pursuant to the Transfer Agreement, Eurofins Group assumed the indemnity obligations to Specialty Labs formerly assumed by BioAlliance Group. Additionally, the complaint alleges that at the time the Transfer Agreement was executed and the transaction closed, Avenard

20

knew that ABL had asserted a claim against the IP licensed by Eurofins Group to Specialty Labs. Yet, according to the complaint, Avenard never came forward with that material information and allowed VI to assume BioAlliance Group's obligations and expenses in connection with the IP. "In short," as the complaint alleges, "Mr. Avenard favored the interests of BioAlliance Group and himself over those of VI." (App. at 51.) Thus, the complaint states a claim that Avenard breached his duty of loyalty to VI by failing to inform VI, at the time he became a director of VI, of ABL's claim against the IP.

The failure to inform VI was potentially harmful to Eurofins Group. VI was assured by contract that there were no known claims that could impact its indemnification responsibilities, but that was not true. Further, it is conceivable that Avenard benefitted from his failure to disclose ABL's claim. As the complaint alleges, Avenard's silence could have been intended to—and, in fact, did—serve BioAlliance Group's interest in avoiding its indemnity obligations to Specialty Labs, because BioAlliance Group knew that ABL had told it (BioAlliance Group) that Specialty Labs' use of the IP violated ABL's patents. It follows that Avenard, the co-founder and chief operating officer of BioAlliance, could have derived personal benefit from shifting the indemnification responsibility from BioAlliance Group to Eurofins Group. These allegations are sufficient to survive a motion to dismiss.[11]

---

[11] Avenard also argues that the complaint against him should be dismissed under Iqbal because it is implausible. Specifically, at oral argument, counsel argued that the economics of the deal make the allegations implausible. What kind of fraud is it,

Thus, we vacate the District Court's dismissal of the breach of loyalty claim against Avenard on the ground that it lacked personal jurisdiction over him.

## C. *Forum Non Conveniens*

Finally, Eurofins Group appeals the District Court's decision to dismiss the complaint against all parties under the doctrine of *forum non conveniens*. We review for abuse of discretion the District Court's dismissal of the complaint under *forum non conveniens*. Windt v. Qwest Comms. Int'l, Inc., 529 F.3d 183, 189 (3d Cir. 2008). For the reasons set forth below, we will affirm the District Court's decision.

Under the doctrine of *forum non conveniens*, a district court may, in the exercise of its sound discretion, dismiss the case where: (1) an alternative forum has jurisdiction to hear the case; and (2) when trial in the plaintiff's chosen forum would establish oppressiveness and vexation to a defendant out of all proportion to the plaintiff's convenience, or when the chosen forum is inappropriate due to the court's own administrative and legal problems. Windt, 529 F.3d at 189 (citing Koster v. (Am.)

---

counsel asked the Court, where you get merely ten dollars up front and agree to provide technical support at cost for three-and-a-half years? Counsel's statement of the contract terms, however, ignored the indemnification provision. It is hardly implausible that an individual may seek to benefit his company, and himself, by offloading the responsibility to indemnify that company's licensees onto another company in which he has a lesser stake.

Lumbermens Mut. Cas. Co., 330 U.S. 518, 524 (1947)).

"[W]hen considering a motion to dismiss on *forum non conveniens* grounds, a district court must first determine whether an adequate alternate forum can entertain the case." Id. at 189-90. If an adequate alternative forum exists, the district court must determine next the appropriate amount of deference to be given the plaintiff's choice of forum. Id. at 190. After the district court has determined the amount of deference due to the plaintiff's choice of forum, the district court must balance the relevant public and private interest factors. Id. "If the balance of these factors indicates that trial in the chosen forum would result in oppression or vexation to the defendant out of all proportion to the plaintiff's convenience, the district court may, in its discretion, dismiss the case on *forum non conveniens* grounds." Id.

Here, the District Court determined that France provides an adequate alternate forum for this litigation. It found that each of the defendants is amenable to service of process in France and that, in any event, none of the defendants will contest personal jurisdiction there. Eurofins, 2009 WL 2992552, at *7. Eurofins Group does not challenge these conclusions. It contends, however, that France constitutes an inadequate forum on several grounds. It argues that French practice neither provides for depositions as a discovery device nor provides a method for obtaining documents from an objecting adversary or non-party. Additionally, Eurofins Group argues that, under French law, it

23

could not compel ABL to appear at trial.[12]

None of these arguments is compelling. Regarding the availability of discovery, there are adequate discovery methods available to litigants under French Law. See, e.g., Ernst v. Ernst, 722 F. Supp. 61, 67-68 (S.D.N.Y. 1989) (France is an adequate forum because "there are several perfectly adequate discovery methods available under French law, albeit not as extensive as those available in our courts."). Concerning the availability of methods to compel ABL to appear at trial, Eurofins Group conceded at oral argument that ABL is already a party to ongoing litigation between these parties in France. (See also Appellees' Br. 40 ("ABL is a party to the French Action now pending in the Commercial Court in Paris, and it has not challenged the jurisdiction of that Court.").) Therefore, even if Eurofins Group correctly states the "virtual impossibility" of attaining evidence from non-parties, this "critical" fact is moot because ABL is a

---

[12] Eurofins Group also argues that France is an inappropriate forum because BioAlliance Group tried, and failed, to negotiate for a French forum selection clause in the Transfer Agreement, and thus could not have reasonably expected to litigate in France. The failure of the parties to agree on a forum to entertain disputes, however, simply means that, in the event of litigation, they would do battle on the issue in court, as the parties in this case are doing now. To say that an agreement to leave an issue for another day creates a roadblock to taking up that issue again is illogical and unfair. The parties' failure to select a forum is not an appropriate basis upon which to conclude that France is an inadequate forum.

24

party to the French litigation.[13]  The Supreme Court has counseled that "in rare circumstances, . . . *where the remedy offered by the other forum is clearly unsatisfactory,* the other forum may not be an adequate alternative." Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255 n.22 (1981) (emphasis added).  Here, because France is not a "clearly unsatisfactory forum," it provides an adequate alternative forum for this litigation.[14]

After concluding that France was an adequate forum for the parties' dispute, the District Court next concluded that the deference owed to Eurofins Group's choice of forum was

---

[13]  Eurofins Group also argues that France is an inadequate forum because of French courts' lack of familiarity with Delaware law.  This is not a ground for finding France an inadequate forum; rather, it is one of the public interest factors that we consider below.  Cf. Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255, 260 (1981) (discussing familiarity of foreign law in the context of public interest factors).

[14]  Where a plaintiff cannot access evidence essential to prove a claim in an alternative forum, that forum is inadequate. Lacey v. Cessna Aircraft Co., 932 F.2d 170, 191 (3d Cir. 1991). Thus, if the communications between ABL and BioAlliance Group were essential to Eurofins Group's claims, and if evidence of those communications was, as Eurofins Group argues, inaccessible to Eurofins Group in France, then France would be an inadequate forum for this case.  ABL, however, is already a party to the litigation in France; thus, whether or how evidence may be procured from non-parties under French procedure is moot.

25

outweighed by the relevant private and public interest factors.[15] The private interest factors that the District Court must consider include

> the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.

Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947). The public interest factors include

---

[15] In its reply brief, Eurofins Group accuses the District Court of failing to accord any deference to its (Eurofins Group's) choice of forum. Since that argument was not raised in Eurofins Group's opening brief, it is waived. See Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Corp., 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue . . . will not suffice to bring that issue before this court."). Regardless, we do not agree that the District Court failed to give Eurofins Group's choice of forum its due deference. In finding that "the plaintiffs' choice of a Delaware forum is far outweighed by the burdens that a Delaware forum would impose on these defendants," Eurofins, 2009 WL 2992552, at *7, the District Court balanced the relevant factors against the deference it had accorded Eurofins Group's chosen forum. Those factors are discussed below.

26

> the administrative difficulties flowing from court congestion; the "local interest in having localized controversies decided at home"; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

Piper Aircraft, 454 U.S. at 241 n.6 (quoting Gulf Oil, 330 U.S. at 509).

The District Court cited the following facts as tipping the balance in favor of litigation in France: "(1) the initial offer for the sale of the IP at issue in this litigation was extended in France by a French entity; (2) the contract at issue in this action was finalized and executed in France; (3) all of the sources of proof are located in France, including documents written in French and key witnesses; and (4) the third-party at the center of this contract dispute conducts business in France." Eurofins, 2009 WL 2992552, at *7.

Regarding the private factors, Eurofins Group argues that, under French practice, it would have no ability to obtain key evidence from non-parties to a suit, such as ABL. This argument repeats one of Eurofins Group's asserted grounds for finding France an inadequate forum, and we reject it on the same grounds as we did in that context. Eurofins Group also points out that not all witnesses are located in France, since ABL is located in Luxembourg, one of Eurofins Group's negotiators is based in New York, and a former, now defunct, sublicensing agent of

27

ABL used to be based in Massachusetts. The record, however, reveals that the majority of key witnesses and sources of proof are, in fact, located in France or the European Union. As such, even if the District Court statement that "all of the sources of proof are located in France" overstated the matter, the Court did not abuse its discretion in deciding that the location of the great majority of proof and witnesses in France favors dismissal.

Our conclusion that personal jurisdiction exists as to Avenard but is lacking over BioAlliance Group bolsters the Court's conclusion that the private interest factors weigh in favor of dismissal because, if the claim against Avenard were to be heard in Delaware, the parties would face the substantial inconvenience of litigating two actions, which involve a common nucleus of operative facts, in two fora. Thus, allowing the action against Avenard to proceed in Delaware would not make trial of this case "easy, expeditious and inexpensive," Gulf Oil, 330 U.S. at 508.

As to the public factors, Eurofins Group contends that the District Court should have given more weight to the fact that the contracts underlying the current dispute are governed by Delaware law. Although the Court should have considered that fact in its analysis, we see no abuse of discretion in what we take to be the thrust of the Court's analysis—that dismissal on *forum non conveniens* grounds is appropriate because the litigation is focused on French defendants' alleged breaches of contract and fiduciary duties, which took place in France, and, therefore France has a more significant interest in resolving the dispute than Delaware. See Lacey v. Cessna Aircraft Co., 862 F.2d 38, 48 (3d Cir. 1988) ("In evaluating the public interest factors the district court must 'consider the locus of the alleged culpable

28

conduct, often a disputed issue, and the connection of that conduct to plaintiff's chosen forum.'" (quoting Van Cauwenberghe v. Biard, 486 U.S. 517, 528 (1988)).

The mere fact that certain documents are written in English is insufficient to change that conclusion. Further, though Delaware has "a significant interest in actively overseeing the conduct of those owing fiduciary duties to the shareholders of Delaware corporations," Armstrong v. Pomerance, 423 A.2d 174, 177 (Del. 1980), that interest is also insufficient to outweigh the locus of the alleged culpable conduct in this case. Additionally, litigation in France will avoid the possibility of incongruous results stemming from parallel actions involving Eurofins Group's claims. The Commercial Court is already endeavoring to resolve this dispute, and will continue its efforts independent of our decision.[16]

---

[16] At oral argument, Eurofins Group argued that the District Court abused its discretion by dismissing the action on the ground of *forum non conveniens* because litigation in France will require a judge schooled in civil law to adjudicate a dispute governed by common law. As this Court observed, that argument would militate against considering France as an appropriate forum in cases originating from our common law system.

While the public interest factors include "the avoidance of unnecessary problems . . . in the application of foreign law," Windt, 529 F.3d at 189, there is no support for the proposition that this factor is so overwhelming that it tips the scales in favor of hearing the case against Avenard in Delaware. Eurofins Group's argument "ignores the Supreme Court's demonstrated

29

Both the private and public interest factors weigh in favor of litigating this dispute in France. Therefore, the District Court did not abuse its discretion by granting BioAlliance Group's motion to dismiss on *forum non conveniens* grounds.

## IV.  CONCLUSION

For the reasons explained above, we affirm the District Court's decision that it does not have personal jurisdiction over BioAlliance Group, we affirm the District Court's denial of Eurofins Group's motion for jurisdictional discovery, we vacate the District Court's decision that it does not have personal jurisdiction over Avenard, and we affirm the District Court's dismissal of the complaint on the ground of *forum non conveniens*.

---

willingness to dismiss a case on *forum non conveniens* grounds even where the alternative forum will be faced with questions of American law." ACLI Int'l Commodity Servs., Inc. v. Banque Populaire Suisse, 652 F. Supp. 1289, 1296 (S.D.N.Y. 1987) (citing Piper Aircraft, 454 U.S. at 260).