**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-2080
_____

NADER TURKI ALDOSSARI,
on behalf of as parent and natural guardian of
Rakan Nader Aldossari,

                                        Appellant

v.

JOSEPH C. RIPP; MOHAMMED BIN NAYEF AL SAUD,
former Crown Prince of Saudi Arabia; THE KINGDOM OF
SAUDI ARABIA; SAUDI EST. FOR DEVELOPMENT OF
RIYADH; SAUDI ARAMCO; EXPORT REFINERY
WESTERN HEMISPHERE, LTD; TRANSCONTINENTAL
OIL AND FINANCIAL GROUP OF AMERICA, INC.;
MOHAMMED BIN SALMAN BIN ABDULAZIZ AL
SAUD, Crown Prince of Saudi Arabia
_____

On Appeal from the United States District Court
For the Eastern District of Pennsylvania
(D.C. No. 2-20-cv-03187)
District Judge:  Honorable Gene E.K. Pratter
_____

Argued
April 13, 2022

Before: AMBRO, JORDAN, and SCIRICA, *Circuit Judges*

(Filed: September 13, 2022)
_____

James T. Tallman   [ARGUED]
Elliott & Davis
6425 Living Place – Suite 200
Pittsburgh, PA   15206
        *Counsel for Appellant*

Katherine C. Cooper
Michael K. Kellogg
Gregory G. Rapawy
Andrew C. Shen   [ARGUED]
Kellogg Hansen Todd Figel & Frederick
1615 M Street, N.W. – Suite 400
Washington, DC   20036
        *Counsel for Kingdom of Saudi Arabia and
        Mohammed Bin Salman Bin Abdulaziz Al Saud*

Lawrence F. Stengel
Saxton & Strump
280 Granite Run Drive – Suite 300
Lancaster, PA   17601
        *Counsel for Mohammed Bin Nayef Al Saud*

Nicolle Kownacki
Carolyn B. Lamm   [ARGUED]
Claire Marsden
Hansel T. Pham
White & Case
701 13th Street, N.W.
Washington, DC   20005
    *Counsel for Saudi Aramco*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Federal courts are courts of limited jurisdiction. Constitutional, prudential, and statutory constraints on our authority prevent us from hearing some cases that are brought to us. For example, disputes under state law between citizens of the same state are typically beyond our adjudicatory power. 28 U.S.C. § 1332. So, too, are actions, like this one, brought against foreign defendants over a transaction executed and performed overseas. Those suits can only proceed in federal court if a sufficient connection – some jurisdictional "hook" – exists between the parties and their dispute on one hand and the United States on the other. This case has no hook.

Nader Turki Aldossari brought suit to recover a debt allegedly owed to his father. In the 1990s, his father's company, Trans Gulf, entered into an agreement in Saudi Arabia with three other businesses. The companies agreed to set up and operate an oil refinery in Saint Lucia, an island nation in the Caribbean. Crude oil for the refinery was to be

sourced from the Saudi government or its national oil company, the Saudi Arabian Oil Company (known colloquially as "Saudi Aramco"). The project went forward, but, it is alleged, the owners of the three contract counterparties – one of whom later became the Crown Prince of Saudi Arabia – conspired to cut Aldossari's father out of the deal by refusing to pay Trans Gulf its promised share of the proceeds. Two decades later, when Aldossari sought recompense for his father's work on the project, the soon-to-be Crown Prince promised to pay but never did. That failure is allegedly a consequence of the Crown Prince only having two years in office before being ousted by his cousin, the current Crown Prince. Aldossari later assigned to his minor son, a U.S. citizen, whatever rights he had to whatever his father was owed. Then, acting on behalf of his son, Aldossari brought suit in the District Court, asserting various tort and contract claims.

The defendants filed motions to dismiss, which the District Court granted with prejudice, holding that Aldossari and his son lacked standing to sue and that most of the defendants – Saudi Arabia, Saudi Aramco, and the current and former Crown Princes – were immune from suit. After Aldossari appealed, the only other defendant who appeared in the case died, and no representative or estate has been substituted.

We hold that dismissal of the claims against that deceased defendant was proper because Aldossari failed to allege any basis for exercising subject-matter jurisdiction over those claims. As for the claims against the surviving defendants, the lack of any meaningful ties between those defendants and the United States in Aldossari's claims defeats his effort to sue them in the United States. This case concerns

4

a decades-old contract among mostly non-U.S. parties, entered into in Saudi Arabia and performed there and in Saint Lucia. There is no meaningful U.S. connection, so, pursuant to the Foreign Sovereign Immunities Act, we lack subject-matter jurisdiction over the claims against Saudi Arabia and Saudi Aramco. And, for similar reasons, we do not have personal jurisdiction over the two Crown Prince defendants. Because the District Court dismissed with prejudice, however, we must vacate its order and remand with directions to dismiss without prejudice, since none of the dispositive rulings reach the merits.

## I.    BACKGROUND

### A.    Factual Background[1]

In December 1994, four companies aiming to establish an oil refinery in Saint Lucia executed an Ownership Agreement in Riyadh, Saudi Arabia.[2] Those parties were Trans Gulf, a Saudi-based company; Saudi Est. for

---

[1] "Because this case comes to us on … motion[s] to dismiss the complaint, we assume that we have truthful factual allegations before us, though many of those allegations are subject to dispute[.]" *Saudi Arabia v. Nelson*, 507 U.S. 349, 351 (1993) (citation omitted).

[2] Aldossari attached a copy of the Ownership Agreement to his complaint, so we can rightly consider it in resolving the motions to dismiss. *See Beverly Enters., Inc. v. Trump*, 182 F.3d 183, 190 n.3 (3d Cir. 1999) (courts may consider the complaint along with "exhibits attached thereto").

Development of Riyadh ("Saudi Est."), another Saudi-based company; Export Refinery Western Hemisphere, Ltd. ("Export"), a British Virgin Islands corporation; and Transcontinental Oil and Financial Group of America, Inc. ("Transcontinental"), a Delaware corporation.[3] Representing Trans Gulf, and signing on its behalf, was Turki bin Faraj bin Nader ("bin Nader"), the father of plaintiff Nader Turki Aldossari.[4] Signing for both Export and Transcontinental was Joseph Ripp, a Pennsylvania citizen who allegedly "controlled" both companies. (J.A. at 83-85, 105.) As for Saudi Est., Aldossari alleges that, at all relevant times, Prince Mohammed bin Nayef bin Abdulaziz Al Saud of Saudi Arabia – who went on to become Crown Prince from 2015 to 2017 – was its owner and acted as its agent.

The parties to the Ownership Agreement agreed to split ownership of the refinery on a roughly equal basis: 25% for Saudi Est., 24% for "Trans Gulf (and his partners as they agree[d] between them),"[5] 25.5% for Export, and 25.5% for

---

[3] The particular business structures of Trans Gulf and Saudi Est. are not alleged, but Aldossari does assert that both entities are based in Saudi Arabia.

[4] Aldossari does not allege, and the Ownership Agreement does not state, the nature of the relationship between his father and Trans Gulf. Aldossari merely describes it as "his [i.e., bin Nader's] company[.]" (J.A. at 85.)

[5] In keeping with the phrase "Trans Gulf and *his* partners," Aldossari, throughout his pleading and briefing, treats Trans Gulf as his father's alter ego, as if there were no

6

Transcontinental.[6]  (J.A. at 85-86, 97-107.)  In exchange, each party took on certain responsibilities.  Saudi Est. promised to obtain, within a year, "a contract for the supply of crude oil from the Government of the Kingdom of Saudi Arabia, and[/]or Saudi Aramco" for the refinery at below-market prices for at least twenty years.  (J.A. at 100, 102.)  Saudi Est. also agreed to send letters to the prime minister of Saint Lucia and to Saudi Aramco "authorizing [bin Nader] … to work with Aramco on behalf of the venture."  (J.A. at 102.)  The "Owner of Saudi Est." – who, again, Aldossari alleges was Prince Mohammed bin Nayef – would sit on the refinery's board of directors.  (J.A. at 85, 102.)  Export, meanwhile, provided an exclusive license it had previously secured from the government of Saint Lucia to "build, own and operate a state of the art Export Petroleum Refinery[.]"  (J.A. at 98.)  Export was tasked with completing "the actual development, financing and construction of the Refinery" in three years; "maintain[ing] good relations with the Government of St. Lucia"; and running the refinery once it was built.  (J.A. at 100.)  Transcontinental was authorized by Export to act on its behalf.  Trans Gulf's role was stated in a memorandum of understanding entered into in September 1994 and

corporate veil between the two.  No acknowledgement is made of any "partners" his father may have had.

[6] Two months before the execution of the Ownership Agreement, bin Nader entered into a side arrangement with Ripp in which Ripp promised that "[Transcontinental,] from its interest in [the refinery,] will give to [bin Nader] an additional 10% for [his] company."  (J.A. at 108.)  It is not made clear what, if anything, bin Nader or Trans Gulf agreed to give Ripp in exchange for that 10% of Ripp's share.

incorporated by reference but not attached to the Ownership Agreement.  The memorandum allegedly said that Trans Gulf and bin Nader "were designated to be the local Manager in Saudi Arabia and the Middle East" by Transcontinental and Export.  (J.A. at 99.)

Aldossari provides scant detail of the parties' performance under the Ownership Agreement.  He does claim, however, that his father, bin Nader, traveled to Saint Lucia in 1995 "on behalf of the former Crown Prince[7] and [the] Saudi Arabian government" to meet with government officials.  (J.A. at 86.)  According to Aldossari, "as a result of the efforts of [his father,] the parties entered into deals for the supply of oil from Aramco."  (J.A. at 86.)  He also says that Export secured an agreement with the Saudi government "and/or" Saudi Aramco for the supply of crude oil, but he does not include a copy of that agreement or explain why it was Export that obtained that contract and not Saudi Est., as the Ownership Agreement provided.  (J.A. at 85.)

At some point, things took a turn for the worse, at least for Aldossari's father.  Aldossari claims that "Ripp and the former Crown Prince acted in concert to breach … the

---

[7] The District Court thought the identity of "the former Crown Prince" was unclear, as neither of the Crown Princes named as defendants in this suit held that title at the time of these events.  It seems a reasonable inference, however, that the term refers to Prince Mohammed bin Nayef, based on the fact that Aldossari elsewhere refers to him as the "former Crown Prince of [the] Kingdom of Saudi Arabia[.]"  (J.A. at 85.)

agreement and cut [bin Nader] out of the deal." (J.A. at 86.) In April 1995, Prince Mohammed bin Nayef "wrote to [bin Nader] stating: '[i]f we make another deal in St. Lucia with the same people or different people, you will get your 24%'" – in other words, bin Nader was being denied his share on the original deal. (J.A. at 86.) According to Aldossari, even though "future agreements and deals resulting in substantial profits transpired," "[n]either [bin Nader] nor Trans Gulf received any payment of profits" under the original deal or any subsequent ones. (J.A. at 87.) Bin Nader died in 1999, leaving behind as heirs his three wives, twelve sons (including Aldossari), and seven daughters.

To all appearances, that was the end of the matter for the next fifteen years. Although the Ownership Agreement provided that "[a]ny dispute between the parties shall be arbitrated in accordance with the rules and regulations then pertaining by the International Chamber of Commerce in Switzerland" (J.A. at 104), there is no indication that Aldossari or his father, or anyone else, ever availed themselves of that dispute-resolution mechanism.

In 2014, however, Aldossari met with Prince Mohammed bin Nayef in London. At that time, says Aldossari, the Prince "acknowledged the agreement" and bin Nader's "right to receive payment" under it. (J.A. at 87.) In Aldossari's telling, the Prince promised that he "had [Aldossari's] father's share" and that he would "arrange for payment … in the coming weeks[.]" (J.A. at 87.) That never occurred. The following year, Prince Mohammed bin Nayef became the Crown Prince of Saudi Arabia, a role he held until 2017, when Prince Mohammed bin Salman bin Abdulaziz Al Saud became the reigning Crown Prince. Aldossari claims that Crown

Prince Mohammed bin Salman placed his predecessor "under house arrest, seized his assets and … prevented [Prince Mohammed bin Nayef] from performing under the Agreement." (J.A. at 87.) Aldossari's pursuit of Trans Gulf's long-delayed rewards had, it seems, run out of luck.

But Aldossari had not run out of determination. In February 2020, he brought his son Rakan Nader Aldossari – a minor and a citizen of Pennsylvania – into the picture.[8] Aldossari executed an "Assignment of Claim" that transferred to Rakan the right to recover on any claims Aldossari had "arising out of the St. Lucia Refinery Ownership Agreement[.]" (J.A. at 83, 96.) In exchange, Rakan would give Aldossari five percent of any amount he recovered. With that new arrangement in place, this litigation began.

## B. Procedural Background

Aldossari filed suit on Rakan's behalf in June 2020 against Trans Gulf's counterparties to the Ownership Agreement – Export,[9] Transcontinental, and Saudi Est. – along with Ripp, the Kingdom of Saudi Arabia, Saudi Aramco, Crown Prince Mohammed bin Salman, and former Crown Prince Mohammed bin Nayef.[10] In his amended complaint,

[8] We use "Aldossari" in this opinion to refer to Nader Turki Aldossari and "Rakan" to refer to his son.

[9] Export was named as a defendant but was not listed as a defendant in any of the specific counts in the complaint.

[10] Where practical, we follow the District Court's lead and refer to the two Crown Princes as the "current Crown Prince" and the "former Crown Prince." The current Crown

10

Aldossari claims that all of the defendants save the current Crown Prince are in breach of contract by failing to pay bin Nader for Trans Gulf's promised share of the profits from the Saint Lucia refinery deal.[11] He also alleges that the former Crown Prince, Saudi Arabia, Saudi Aramco, Saudi Est., and Ripp are liable in quantum meruit for the services that bin Nader provided them in his role as the "local manager in Saudi Arabia and the [M]iddle [E]ast" for Transcontinental and Export and through meeting with Saint Lucia government officials to move the deal along. (J.A. at 89-90.) And he further asserts that Ripp intentionally interfered with bin Nader's contractual relationships by working to prevent bin Nader, his estate, and Trans Gulf from receiving their share of the profits. Finally, Aldossari alleges that the current Crown Prince intentionally interfered with contractual relations by "act[ing] to undermine the efforts" of the former Crown Prince, Saudi Arabia, Saudi Aramco, and Saudi Est. to "fulfill their obligations" to bin Nader and his descendants, including by

---

Prince was not named as a defendant in the original complaint but was added upon amendment.

[11] Specifically, Aldossari asserts one claim against the former Crown Prince, Saudi Arabia, Saudi Aramco, and Saudi Est. for breaching the Ownership Agreement by failing to pay "bin Nader and his company" 24% of the profits from the Saint Lucia deal. (J.A. at 87-88.) He also brings a separate claim against Ripp and Transcontinental for their nonpayment of both Trans Gulf's cut under the Ownership Agreement and the 10% of Ripp's cut bin Nader and Trans Gulf were promised in the side deal.

11

placing the former Crown Prince "under house arrest" and seizing his assets.[12]  (J.A. at 91-92.)

Export, Transcontinental, and Saudi Est. did not enter appearances in the District Court – in fact, Aldossari did not even attempt to serve them.[13]  Ripp, Saudi Aramco, Saudi Arabia, and the current Crown Prince were served (or waived service),[14] entered appearances, and moved to dismiss on a number of grounds including the statute of limitations, lack of subject-matter and personal jurisdiction, improper venue, and failure to state a claim.  A little more than a week before the District Court ruled on the motions, the former Crown Prince entered an appearance, but he did not file a responsive pleading prior to the Court's decision.

The District Court held that it lacked subject-matter jurisdiction over Aldossari's claims and dismissed the entire case.  It first concluded that Aldossari lacked standing to

---

[12] Aldossari does not identify the source of law for his claims, but to the extent the claims are meant to invoke common-law rights, as appears to be the intent, they are not rooted in federal law.  *See Cassirer v. Thyssen-Bornemisza Collection Found.*, 142 S. Ct. 1502, 1507 (2022) (describing "non-federal claims" in a suit against a foreign sovereign as those "relating to property, torts, contracts, and so forth").

[13] Aldossari does not list those entities as parties to this appeal.

[14] Saudi Aramco argued in its motion to dismiss that Aldossari's efforts to serve it were deficient, although it does not reassert that argument before us.

12

pursue any of the claims against any of the defendants. Neither he nor even bin Nader was a party to or a beneficiary of the Ownership Agreement, the Court observed. And even if bin Nader had suffered a cognizable injury, Aldossari and Rakan – who were not proceeding on behalf of bin Nader's estate – suffered no injury by virtue of the defendants' nonpayment.

As a separate basis for dismissal, the Court also held that each defendant other than Ripp was immune from suit. It determined that the Foreign Sovereign Immunities Act of 1976 (the "FSIA"), 15 U.S.C. § 1602 *et seq.*, did not allow for jurisdiction over the claims against Saudi Arabia and Saudi Aramco. No jurisdiction existed over the claims against the current Crown Prince, meanwhile, because the common law of conduct-based immunity for officials of a foreign government entitled him to dismissal. And although the former Crown Prince had not yet moved to dismiss, the Court sua sponte concluded that he, too, was immune from suit on common-law conduct-based immunity grounds.

The Court ordered dismissal without prejudice, but when Aldossari elected to stand on his complaint, it converted its order to a dismissal with prejudice. Aldossari then timely appealed. Three months later, Aldossari's counsel informed us that Ripp had died.

13

## II.    DISCUSSION[15]

### A.    Sequence of Decision

The District Court dismissed the case because it concluded that Aldossari lacked standing to pursue any of his claims and therefore the Court had no subject-matter jurisdiction over the case. We agree that the claims were properly dismissed, but we take a different route to arrive at that conclusion.

The standing analysis here would necessitate reaching complex, fact-bound determinations. Those issues include whether bin Nader suffered a cognizable injury-in-fact from the breach of a contract to which he was not formally a party, although the company he allegedly owned was a party and he personally was named in the contract as a participant in the transaction. They also include whether Aldossari can rely on his status as an heir to his father (and on an alleged promise of payment from the former Crown Prince) to seek recovery of funds supposedly owed to bin Nader. Moreover, while the parties agree that Pennsylvania's choice-of-law rules apply, *see Cassirer v. Thyssen-Bornemisza Collection Found.*, 142 S. Ct. 1502, 1506-08 (2022) (in a lawsuit asserting non-federal claims against a foreign sovereign, courts must apply "the forum State's choice-of-law rule"), they dispute whether,

---

[15] Aldossari invoked the FSIA as a basis for the District Court's subject-matter jurisdiction. 28 U.S.C. §§ 1330 and 1604. As discussed, *infra*, in Section II.B, however, the FSIA does not provide subject-matter jurisdiction in this case. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

14

under those rules, we should apply the substantive law of Saudi Arabia or Pennsylvania. They also disagree on the contents of those two bodies of law. For example, Aldossari and Saudi Arabia submitted dueling affidavits regarding the rights of heirs to bring suit under Saudi law.

It is questionable whether the standing questions in this case even implicate the constitutional limits of Article III at all. Instead, those issues may turn on non-jurisdictional doctrines like prudential limits on shareholder and contractual standing and the "real party in interest" requirement embodied in Federal Rule of Civil Procedure 17. *See, e.g.*, *Potter v. Cozen & O'Connor*, No. 21-2258, --- F.4th ----, 2022 WL 3642107, at *3, *6 (3d Cir. Aug. 24, 2022) ("the shareholder standing rule," which generally prohibits shareholders from suing based on an "indirect injury" suffered because of harm to the corporation, is "a prudential rule, not a constitutional or jurisdictional one"); *Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*, 11 F.4th 345, 350 (5th Cir. 2021) (arguments that a plaintiff lacks "contractual standing" – meaning that he "does not have a contractual right to bring [a] suit" – "do not go to the court's subject matter jurisdiction, but are instead part of the inquiry into the merits of a particular claim"); *Martineau v. Wier*, 934 F.3d 385, 391 (4th Cir. 2019) (question of whether plaintiff "was legally entitled to pursue … claims on her own behalf, or whether the claims belonged solely to [a third party]" "implicates not Article III standing doctrine, but rather the 'real-party-in-interest' requirement").

On this record, however, we need not delve into those questions, because we can dispose of the claims against each defendant on other, more straightforward threshold grounds. As to Saudi Arabia and Saudi Aramco, we agree with the

15

District Court that statutory subject-matter jurisdiction pursuant to the FSIA is lacking over the claims against them. The dismissal of both Crown Princes was appropriate given that there is no personal jurisdiction over either of them. Finally, the claims against Ripp were correctly dismissed because of the absence of any alleged basis for exercising subject-matter jurisdiction over them. And even if there were a jurisdictional foundation for suing Ripp, we would dismiss the appeal against him, given our authority under Federal Rule of Appellate Procedure 43 to "direct appropriate proceedings" if a party dies during the pendency of an appeal. Aldossari's inability to overcome each of those hurdles – all of which are threshold issues and are discussed in greater detail below – is more apparent to us than is a resolution of the standing issues.[16]

---

[16] Ordinarily, upholding a district court's order of dismissal on alternate grounds supported by the record is well within our discretion. *Watters v. Bd. of Sch. Dirs.*, 975 F.3d 406, 412-13 (3d Cir. 2020). Yet the general "requirement that [subject-matter] jurisdiction be established as a threshold matter" would seem to mandate that we begin our analysis by addressing the standing questions raised by the parties. *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 94 (1998). That rule does not present a problem here, however, because it "does not dictate a sequencing of jurisdictional issues[,]" *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999), and "federal courts have flexibility to choose among alternate 'grounds for denying audience to a case on the merits[,]'" *Reading Health Sys. v. Bear Stearns & Co.*, 900 F.3d 87, 95 (3d Cir. 2018) (quoting *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007)). As discussed further herein, each of the issues on which we resolve this appeal – Civil Rule 8(a)(1), Appellate Rule 43, the FSIA, and

16

If we felt free to do so, we might well address the glaring statute-of-limitations defect in Aldossari's complaint, which was brought decades after the main events in this case.[17]

---

personal jurisdiction – leads to a "[d]ismissal short of reaching the merits[.]" *Sinochem*, 549 U.S. at 431. Since that means that we "will not 'proceed at all' to an adjudication of the cause[,]" those issues "may be resolved before addressing jurisdiction." *Id.* Our decisional path therefore does no disservice to the limits on our authority as a federal court.

[17] Pennsylvania's choice-of-law rules, which everyone agrees we should apply, include a "borrowing statute" providing that the statute of limitations for a claim "accruing outside this Commonwealth" is the one "provided or prescribed [either] by the law of the place where the claim accrued or by the law of this Commonwealth, whichever first bars the claim." 42 Pa. Cons. Stat. § 5521(b). Although the relevant limitations period under Saudi law is in dispute, Pennsylvania law requires that both breach-of-contract and quantum meruit claims be brought within four years of the date of accrual. 42 Pa. Cons. Stat. § 5525(a)(4), (8). The clock started running on the breach-of-contract claims on the date when payment under the Ownership Agreement was due, *Raucci v. Candy & Toy Factory*, 145 F. Supp. 3d 440, 449 (E.D. Pa. 2015), and on the quantum meruit claim on "the date on which the relationship between the parties [was] terminated[,]" *Cole v. Lawrence*, 701 A.2d 987, 989 (Pa. Super. Ct. 1997). Any improper nonpayment to bin Nader, and the end of his relationship with the defendants, took place, at the latest, upon his death in 1999. So, under the borrowing statute, it would seem that Aldossari had at most four years

17

It is not immediately obvious, however, that the statute of limitations counts as a threshold non-merits issue. *Compare Elkadrawy v. Vanguard Grp.*, 584 F.3d 169, 173 (3d Cir. 2009) (holding that "a dismissal on statute-of-limitations grounds [is] a judgment on the merits" for res judicata purposes (quoting *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 228 (1995)), *with United States v. Doe*, 810 F.3d 132, 150 (3d Cir. 2015) (bypassing jurisdictional inquiry to resolve claim on statute-of-limitations ground under the Antiterrorism and Effective Death Penalty Act), *and In re Briscoe*, 448 F.3d 201, 220 (3d Cir. 2006) ("[T]he statute of limitations is a defense … that does not truly go to the merits of the plaintiff's claim in any sense."). Fortunately, this is another line of inquiry we can bypass, since we can more readily resolve the appeal on other bases.

## B. Saudi Aramco and Saudi Arabia: Foreign Sovereign Immunities Act[18]

The District Court held that it lacked subject-matter jurisdiction over the claims against Saudi Arabia and Saudi

---

from then to file suit, putting him more than fifteen years out of time on his main claims. The only defendants against whom there is possibly an allegation of an act that doesn't reach back decades are the Crown Princes, neither of whom asserted a statute-of-limitations defense.

[18] "A determination [regarding] the existence of subject matter jurisdiction under the FSIA is a legal question subject to plenary review[,]" *Fed. Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1282 (3d Cir. 1993), and Aldossari, as plaintiff, bears the burden of establishing jurisdiction, *Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015). Saudi

Aramco under the FSIA, which provides "the sole basis for obtaining jurisdiction over a foreign state in [the federal] courts." *Argentine Republic v. Amerada Hess Shipping*, 488 U.S. 428, 434 (1989). "[A] statutory standing question can be given priority over an Article III question" like standing, so we are free to resolve the claims against Saudi Arabia and Saudi Aramco on FSIA grounds. *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 97 n.2 (1998); *see also Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493-94 (1983) (directing district courts to ensure that the FSIA has been satisfied "[*a*]*t the threshold* of every action … against a foreign state" (emphasis added)).

A district court has jurisdiction over a civil action against a "foreign state" if the state is not entitled to immunity, which is the case only if "one of the specified exceptions to foreign sovereign immunity" in the FSIA applies.[19] *Verlinden*

---

Arabia and Saudi Aramco have asserted facial challenges to subject-matter jurisdiction, meaning that they have argued that Aldossari has not adequately alleged the existence of jurisdiction. *Id.* at 105-06. In response, Aldossari cites both to the complaint and to facts outside it. Evidence "beyond the pleadings[,]" however, is more appropriately presented in defending against a factual attack, which "is an argument that there is no subject matter jurisdiction because the facts of the case … do not support the asserted jurisdiction." *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014). Regardless, on this complaint and record, there is no basis for jurisdiction under either standard.

[19] Those exceptions "include cases involving the waiver of immunity, [28 U.S.C.] § 1605(a)(1), commercial activities

*B.V.*, 461 U.S. at 489, 493 (citing 28 U.S.C. §§ 1330(a), 1604). Although the FSIA speaks of foreign "states," its reach extends to any "agency or instrumentality of a foreign state[.]" 28 U.S.C. § 1603(a). An entity falls within that category if it "is a separate legal person, corporate or otherwise"; is an "organ" of, or has a majority of its shares owned by, a foreign state or a political subdivision of a state; and is not a citizen of a U.S. state or "created under the laws of any third country." *Id.* § 1603(b).

It is undisputed that Saudi Arabia is a foreign state and that Saudi Aramco, the Kingdom's state-owned oil company, is an agency or instrumentality of the Saudi government. So, under the FSIA, they are both presumptively immune – and there is no jurisdiction over the claims against them – unless Aldossari can show that an exception to immunity applies. 28 U.S.C. §§ 1330(a), 1604; *Fed. Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1285 (3d Cir. 1993) (holding that once a defendant makes a prima facie showing that it is a foreign state, "the burden then shift[s] to the plaintiff[] to establish that one of the exceptions to immunity applie[s]," although the

---

occurring in the United States or causing a direct effect in this country, § 1605(a)(2), property expropriated in violation of international law, § 1605(a)(3), inherited, gift, or immovable property located in the United States, § 1605(a)(4), non-commercial torts occurring in the United States, § 1605(a)(5), and maritime liens, § 1605(b)." *Argentine Republic*, 488 U.S. at 439. Also excepted are cases involving arbitration agreements or arbitral awards, § 1605(a)(6), preferred mortgages, § 1605(d), terrorism, §§ 1605A–1605B, and counterclaims to actions brought by foreign states, § 1607.

20

defendant still bears "the ultimate burden of proving immunity from suit"); *Blue Ridge Invs., L.L.C. v. Republic of Argentina*, 735 F.3d 72, 83 (2d Cir. 2013) (same).

Aldossari invokes two of those exceptions: waiver and commercial activity.[20]  The District Court held that neither was satisfied, and we agree.

### 1.      Waiver

A foreign state is not immune if it has "waived its immunity either explicitly or by implication[.]"  28 U.S.C. § 1605(a)(1).  The text of the FSIA does not specify the standard for identifying a waiver, but we join "the virtually unanimous precedent" from our sister circuits that construes the waiver exception strictly and requires "strong evidence" – in the form of "clear and unambiguous" language or conduct – that the foreign state intended to waive its sovereign immunity. *Khochinsky v. Republic of Poland*, 1 F.4th 1, 8 (D.C. Cir. 2021) (quoting *Creighton Ltd. v. Government of Qatar*, 181 F.3d 118, 122 (D.C. Cir. 1999)); *Architectural Ingenieria Siglo XXI, LLC v. Dominican Republic*, 788 F.3d 1329, 1338 (11th Cir. 2015);

---

[20] Aldossari did not affirmatively rely on those exceptions in his complaint, but Saudi Arabia and Saudi Aramco preemptively addressed the commercial-activity exception in their motions to dismiss.  Aldossari's waiver argument, meanwhile, was first raised in his surreply to Saudi Aramco's motion.  Even though the District Court thought that use of the surreply was improper, it resolved the waiver-exception issue on the merits, since Saudi Arabia had anticipated it when moving to dismiss.  We, too, will rule on that issue, as the parties have briefed it before us.

*see also Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 243 (2d Cir. 1996) (collecting cases reading § 1605(a)(1) narrowly).  That approach accords with how we analyze claims that Congress has waived the United States' sovereign immunity.  In such cases, we require that a waiver be "unequivocally expressed," *United States v. Craig*, 694 F.3d 509, 511 (3d Cir. 2012), and read any such waiver "narrowly, in favor of the government[,]" *Doe v. United States*, 37 F.4th 84, 86 (3d Cir. 2022).  We will do the same in evaluating potential waivers by foreign sovereigns.

Aldossari argues that the King of Saudi Arabia waived sovereign immunity in a speech in June 2015, when the King said (according to Aldossari) that "here, any citizen can file lawsuits against the King, Crown Prince or other members of the Royal Family."[21]  (J.A. at 187.)  According to a report prepared by an expert on Saudi law and submitted by Aldossari, the King also said in his speech that "no one is above the law and that any citizen has the right to file any kind of lawsuit against the King, the Crown Prince or any private or governmental entity."  (J.A. at 184.)  Aldossari concedes that the King's statement did not "speak directly to suits outside Saudi Arabia" and "permitted … suits [by Saudi citizens] *in Saudi Arabia*[,]" but he nonetheless asks us to construe the statement's effect as extending beyond that nation's borders. (Opening Br. at 13 (emphasis added).)

---

[21] The speech was made in Arabic; the above translation comes from the caption of a YouTube video of the King's speech, a screenshot of which Aldossari entered into the record.  For the sake of argument only, we accept the accuracy of the translation.

22

We decline to adopt such a broad reading of the King's remarks. Even ignoring the word "here," which obviously means "here in Saudi Arabia" and thus signals the geographical limits the King intended to convey, nothing in his statement, as it has been translated and summarized to us, addressed suits brought in courts outside of Saudi Arabia.[22] Nor does Aldossari offer any basis for inferring that the King meant to waive his government's sovereign immunity in every tribunal in every country in the world, which would be the necessary consequence of agreeing with Aldossari's view. Instead, Aldossari insists that failing to recognize a waiver of immunity in U.S. courts would give Saudi Arabia and Saudi Aramco "more protection [here] than … in their own courts." (Opening Br. at 13.)

That may be the case, but it is no reason to reach the conclusion Aldossari wants. Courts have "uniformly concluded" that "a waiver of sovereign immunity in domestic courts does not by itself evidence an intent on the part of the sovereign entity to waive immunity from suit in the United States." *Corzo v. Banco Central de Reserva del Peru*, 243 F.3d 519, 523 (9th Cir. 2001) (collecting cases). Indeed, one of the fundamental "privilege[s] of sovereignty" is the ability to

---

[22] The parties dispute whether the speech had binding legal effect. Aldossari claims that the speech was a "Royal Decree" and therefore became part of Saudi law, but Saudi Arabia rejects that characterization. We do not wade into that disagreement, as the statement is not enough to establish a clear and unambiguous waiver of Saudi Arabia's immunity in U.S. courts, even if it carried the force of law in the Kingdom.

"consent to certain classes of suits while maintaining … immunity from others[.]" *Alden v. Maine*, 527 U.S. 706, 758 (1999).

And there is good reason to conclude that Saudi Arabia has exercised that privilege. Customary international law, like the FSIA, operates under a presumption that a state is immune from suit in foreign courts, subject only to a handful of exceptions. *See* David P. Stewart, *The UN Convention on Jurisdictional Immunities of States and Their Property*, 99 Am. J. Int'l L. 194, 195 (2005) (noting the historical "virtual unanimity in international law and practice that sovereigns … were absolutely immune from the jurisdiction of foreign courts[,]" which eventually softened to permit suits "when claims ar[o]se from [states'] commercial transactions or 'private law' activities"). To that end, the United Nations Convention on Jurisdictional Immunities of States and Their Property, to which Saudi Arabia is a party, recognizes that "[a] State enjoys immunity … from the jurisdiction of the courts of another State[,]" subject to a handful of specified limitations not at issue here. U.N. Convention on Jurisdictional Immunities of States and Their Property, art. 5, *opened for signature* Jan. 17, 2005, https://treaties.un.org/doc/Treaties/2004/12/20041202 %2003-50%20PM/CH_III_13p.pdf; *see also id.* arts. 10-17 (enumerating exceptions to immunity). The treaty has not yet gone into effect, but Saudi Arabia's accession to it is nevertheless evidence that the Kingdom intends to avail itself of its immunity in U.S. courts whenever it may lawfully do so. In light of those background principles, and construing the King's statement narrowly, we detect on this record no

indication that waiving immunity worldwide is "what [Saudi Arabia] intended[.]"[23] *Khochinsky*, 1 F.4th at 8.

## 2. Commercial Activity

A foreign state is also not immune from any action "based upon" (1) "a commercial activity carried on in the United States by the foreign state[,]" (2) "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere[,]" or (3) "an act outside … the United States in connection with a commercial activity of the foreign state elsewhere" that "causes a direct effect in the United States[.]" 28 U.S.C. § 1605(a)(2). "Commercial activity" can be either "a regular course of commercial conduct" or "a particular commercial transaction or act." *Id.* § 1603(d). And commercial activity is "carried on in the

---

[23] Aldossari's waiver argument appears to invoke express, rather than implied, waiver. To the extent he also asserts an implied waiver, courts have typically found such waivers only in three scenarios: when the foreign state has entered into a contract with a choice-of-law clause mandating the use of U.S. law, when it has responded to a complaint without asserting immunity, or when it has agreed to arbitrate disputes in the United States. *Ivanenko v. Yanukovich*, 995 F.3d 232, 239 (D.C. Cir. 2021); *accord In re Tamimi*, 176 F.3d 274, 278 (4th Cir. 1999) (citing H.R. Rep. 94-1487, at 18 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6604, 6617) (sourcing those scenarios from the FSIA's legislative history). None of those things is said to have happened in this case. But, because Aldossari has not squarely presented the issue, we need not consider whether to join our sister circuits' approach to implied waiver.

25

United States[,]" for purposes for the first clause of § 1605(a)(2), if it has "substantial contact" with this country. *Id.* § 1603(e).

We have laid out a two-step framework for analyzing a claimed exception to immunity based on commercial activity. First, we ask whether there is a "sufficient jurisdictional connection or nexus between the commercial activity and the United States" – in other words, whether the foreign state has engaged in conduct that satisfies one of the three clauses of § 1605(a)(2). *Fed. Ins. Co.*, 12 F.3d at 1286. Second, we look to see if there is a "substantive connection or nexus" between the relevant commercial activity or act and "the subject matter of the cause of action[,]" *id.* – that is, whether the cause of action is "based upon" the relevant commercial activity or "act … in connection with a commercial activity[,]" 28 U.S.C. § 1605(a)(2).

Aldossari argues that three facts show he has satisfied the exception. They are that Saudi Arabia, through Saudi Aramco, "has engaged in routine, regular, and substantial commercial activities in the United States concerning the oil market for decades" (Opening Br. at 18); that those two defendants entered into business with Ripp, a U.S.-based individual; and that Aldossari's son Rakan is a Pennsylvania resident. None of those things, however, can bear the weight Aldossari puts on them.

The first assertion – that Saudi Aramco engages in regular oil-related business in and affecting the United States– may be enough to establish a "commercial activity carried on in the United States" under the first clause of § 1605(a)(2), at

26

least as to Saudi Aramco.[24]  But Aldossari's argument nonetheless fails because he has not shown any "substantive connection or nexus between th[at] commercial activity and the subject matter of [his] cause of action." *Fed. Ins. Co.*, 12 F.3d at 1286.

To establish such a nexus, Aldossari must show that his suit against the sovereign defendants is "based upon" a relevant commercial activity or act.  28 U.S.C. § 1605(a)(2).  "[A]n action is 'based upon' the 'particular conduct' that constitutes the 'gravamen' of the suit[,]" so we must "zero[] in on the core of [Aldossari's] suit" – the allegations of "sovereign acts that actually injured [him]." *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015) (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 356-57 (1993)).

---

[24] We assume this point without deciding it.  Aldossari claims that Saudi Aramco's commercial activity is also attributable to the Saudi government.  Given the "strong presumption" that government instrumentalities are distinct from their sovereign, however, we could only make that leap if Aldossari were to demonstrate that Saudi Arabia has "extensive control" over Saudi Aramco. *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 140-41 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2762 (2020).  That calls for showing, among other things, "the level of economic control" by the government and "the degree to which government officials manage the entity or otherwise have a hand in its daily affairs[.]" *Id.*  Aldossari's say-so is not enough to meet that burden.  And even if the record supported such a conclusion, we would still lack subject matter jurisdiction over the claims against Saudi Arabia, as further discussed herein.

27

The gravamen of Aldossari's suit has nothing to do with Saudi Aramco's broader oil operations in the United States. Rather, his complaint focuses very specifically on the money he says his father was owed – but wrongfully denied – on the Saint Lucia refinery deal. It is not clear what legal theory Aldossari is relying on to hold Saudi Arabia and Saudi Aramco responsible for that alleged loss. They were not parties to the Ownership Agreement and are alleged to have been involved only in a separate "contract for the supply of crude oil from … the Kingdom of Saudi Arabia and/or Saudi Aramco." (J.A. at 85-86.) But even if they could somehow be liable for a breach of the Ownership Agreement, that agreement was executed in Saudi Arabia, involved performance there and in Saint Lucia, and set Switzerland as the locale for the resolution of disputes. The corollary agreement for the supply of crude oil involved only Saudi Arabia and Saint Lucia. Any harm suffered by Aldossari's father (and so by Aldossari, if we accept his asserted right to claim what his father was owed) came from being denied a share of the profits of the refinery project and so involved only Saudi Arabia or Saint Lucia, with Switzerland in the background. His alleged injury has nothing to do with Saudi Aramco's worldwide or U.S.-based oil operations. As a result, there is no "substantive nexus" between the supposed injury and the claimed commercial activities, *Fed. Ins. Co.*, 12 F.3d at 1286, and so those activities fail to establish jurisdiction.

Next, Aldossari tries to fit his second and third jurisdictional "facts" – the U.S. citizenship and domicile of Ripp, and Rakan's U.S. citizenship – into § 1605(a)(2)'s third clause, by arguing that the acts and commercial activities at the heart of this lawsuit had a "direct effect" in the United States.

In *Republic of Argentina v. Weltover, Inc.*, the Supreme Court clarified that "an effect is 'direct' if it follows 'as an immediate consequence of the defendant's … activity[,]'" even if it is not "substantial[]" or "foreseeab[le.]" 504 U.S. 607, 618 (1992). In that case, for instance, Argentina unilaterally rescheduled the maturity date on some of its bonds for which New York was the designated place of payment. *Id.* at 618-19. "Because New York was thus the place of performance for Argentina's ultimate contractual obligations," said the Court, "the rescheduling of those obligations necessarily had a 'direct effect' in the United States: Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming." *Id.* at 619. Courts applying *Weltover* in breach-of-contract disputes like this one have held that "breaching a contract that establishes or necessarily contemplates the United States as a place of performance causes a direct effect in the United States, while breaching a contract that does not establish or necessarily contemplate the United States as a place of performance does not cause a direct effect in the United States." *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 40 (D.C. Cir. 2014) (Kavanaugh, J.), *abrogated on other grounds by Sachs*, 577 U.S. 27.[25]

_____

[25] *Accord, e.g.*, *Rogers v. Petroleo Brasileiro, S.A.*, 673 F.3d 131, 139-40 (2d Cir. 2012) (no direct effect in the United States when "there was no requirement that payment be made in the United States nor any provision permitting the [party entitled to payment] to designate a place of performance" and "nothing in the language of the [contract] … suggest[ed] a reasonable understanding that the United States could be a possible place of performance"); *Samco Glob. Arms, Inc. v. Arita*, 395 F.3d 1212, 1217 (11th Cir. 2005) (no direct effect because "no monies or goods were due in the United States");

While we do not undertake an exhaustive canvass of the circumstances in which an effect in the United States may be sufficiently "direct," it is plain that Aldossari has not pleaded facts presenting such an effect here.[26]   The "place of performance for [the parties'] ultimate contractual obligations" under the Ownership Agreement, *Weltover*, 504 U.S. at 619, was in Saudi Arabia, where the crude oil for the refinery was sourced and where bin Nader was to serve as the "local Manager[,]" and in Saint Lucia, where the refinery was to be built and operated.  (J.A. at 99-100.)  There is no suggestion that any party to the main deal or to the corollary transactions was required or expected to perform any obligation in the United States.

Importantly, the particular contractual duty that Aldossari claims went unfulfilled – payment to Trans Gulf and

---

*United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n*, 33 F.3d 1232, 1237 (10th Cir. 1994) (no direct effect when "no part of the contract in this case was to be performed in the United States" and "the defendants' performance of their contractual obligations had no connection at all with the United States").

[26] For instance, we can resolve this case without wading into the circuit split about whether a direct effect must involve "legally significant acts" in the United States.  *See Am. Telecom Co. v. Republic of Lebanon*, 501 F.3d 534, 540 (6th Cir. 2007) (noting that some circuits require such an act, some consider it without mandating that one be demonstrated, and others disclaim any reliance on the legally-significant-act standard).

30

bin Nader – would have been expected in Saudi Arabia, where bin Nader and Trans Gulf were located.[27] Aldossari does not allege that any of the "arrangement[s] [between the parties] called for [the] use of [a U.S.] bank account or invited [a party] to demand payment within the United States[.]" *Valambhia v. United Republic of Tanzania*, 964 F.3d 1135, 1142 (D.C. Cir. 2020), *cert. denied,* 141 S. Ct. 2512 (2021). He points us to letters that Ripp sent from his offices in the United States to bin Nader concerning the deal and their side arrangement, but neither those letters nor the terms of any of the relevant agreements (at least as revealed to us) evince an obligation by any of the parties to send money into or out of U.S.-based financial accounts.[28] Any effects felt in the United States from

---

[27] There is one potential direct effect in the United States that Aldossari does not mention. Transcontinental's receipt of payment for its share of the proceeds of the refinery project may have taken place in accounts located in the United States, though that is a matter of speculation. Even if that qualified as a direct effect, however, this case is "based upon" the nonpayment to bin Nader, not Transcontinental's collection of its cut of the profits, and so the flow of money to Transcontinental does not bring this case within the commercial-activity exception.

[28] It is also doubtful that, even if Ripp had expressly promised to send money from an account based in the United States, that would have sufficed on its own to satisfy § 1605(a)(2)'s third clause. *Cf. Valambhia v. United Republic of Tanzania*, 964 F.3d 1135, 1142 (D.C. Cir. 2020) (suggesting that a "foreign sovereign's unilateral choice to make payments from a U.S. account" is insufficient absent "multiple

31

the commercial activities at the heart of this case were therefore indirect.

The U.S. domicile of one of the defendants – Ripp – does not change the analysis.[29] The mere presence in a lawsuit of a U.S. defendant cannot justify hailing into court foreign sovereign parties that have engaged in a purely overseas business relationship with the plaintiff. *See Maizus v. Weldor Tr. Reg.*, 820 F. Supp. 101, 104 (S.D.N.Y. 1993) ("[T]his Court is aware of no case in which" "the fact that one of the … defendants … is an American corporation[,]" without more, "has been found to be a sufficient basis for jurisdiction under the FSIA."). From all appearances, Ripp was domiciled in the United States whether or not the oil refinery deal took place; there is no coherent argument for saying that their domiciles in this country were somehow an "effect" of the events underlying this case. *See Effect*, Black's Law Dictionary (6th ed. 1990) ("result; outcome; consequence"); *Effect*, Webster's Third New International Dictionary (1971) ("something that is produced by an agent or cause [or] something that follows immediately from an antecedent"). Unless a defendant's location in the United States somehow stemmed from the events underlying the lawsuit, it cannot be said that the defendant's domicile is an "effect," much less a direct effect,

[additional] indicia of direct effect in the United States"), *cert. denied,* 141 S. Ct. 2512 (2021).

[29] Aldossari also tries to leverage the U.S. domicile of Transcontinental, but he did not even serve that corporation, nor did it enter an appearance, so it is not truly a defendant in this case. Even if it were, our discussion of the effect of Ripp's U.S. citizenship and domicile applies with equal force to it.

32

of any acts upon which the suit is based. *See Weltover*, 504 U.S. at 618 (requiring that a direct effect be "an immediate consequence" of the foreign state defendant's actions).

And the same holds true if, as here, a plaintiff is based in the United States. Absent an indication that the plaintiff's U.S. residence or citizenship came about as a result of the subject matter of the litigation, his location is not an "effect" of any pertinent act. *See Odhiambo*, 764 F.3d at 40 (a plaintiff's "U.S. presence or U.S. citizenship alone [cannot] … suffice[] to create a direct effect in the United States"); *Adler v. Federal Republic of Nigeria*, 107 F.3d 720, 726-27 (9th Cir. 1997) ("[M]ere financial loss by a person … in the U.S. is not, in itself, sufficient to constitute a 'direct effect.'"). The plaintiff's location or citizenship tells us nothing of any effects caused by the defendants' acts. A contrary rule would permit jurisdiction in practically every case in which a U.S. domiciliary claimed harm from the acts of a foreign sovereign, an outcome that would undermine the FSIA's background presumption of affording immunity to foreign states.[30] *See Westfield v. Fed. Republic of Germany*, 633 F.3d 409, 414 (6th Cir. 2011) ("[W]e are … wary of

---

[30] Aldossari's attempt to rely on Rakan's citizenship to establish a direct effect in the United States is particularly strained, given that Rakan played no part in (and was not even alive during) the commercial transactions at issue here. Any effect on Rakan is too "remote and attenuated[,]" since it was caused by the "intervening act" of Aldossari assigning his claims to Rakan. *Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1133-34 (9th Cir. 2012) (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992)).

applying [the 'direct effect'] requirement too loosely such that our courts become a haven for airing the world's disputes.").

In sum, the very few and thin strands of this case that pass through the United States are insufficient to justify exercising jurisdiction under the FSIA over the claims against Saudi Arabia and Saudi Aramco. The District Court's dismissal of those claims for lack of subject-matter jurisdiction was thus fully justified.

## C.    The Crown Princes: Personal Jurisdiction[31]

The District Court held that both the current and the former Crown Prince were entitled to dismissal under the common law of immunity for officials of foreign governments. *See Samantar v. Yousuf*, 560 U.S. 305, 319, 325 (2010) (holding that the common law, rather than the FSIA, governs the immunity of foreign officials). We need not decide whether that analysis was correct, because we can instead hold that their dismissal from the suit was proper because the District Court lacked personal jurisdiction over either of them.

---

[31] Considering in the first instance the Crown Princes' arguments for dismissal on personal-jurisdiction grounds, we "must accept all of [Aldossari's] allegations as true and construe disputed facts in [his] favor[,]" just as we would in reviewing a district court's ruling on a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction. *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002) (citations omitted). Aldossari nonetheless bears the ultimate burden of "demonstrating the facts that establish personal jurisdiction[.]" *Id.*

Although we typically begin our analysis in each case by ensuring that we have subject-matter jurisdiction over the claims, we have discretion to instead start with personal jurisdiction when we are presented with "a straightforward personal jurisdiction issue presenting no complex question of state law" and when resolving the subject-matter jurisdiction issue would implicate "difficult and novel question[s.]" *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 578, 588 (1999). That is the case here. Both Crown Princes' claims of immunity as officials of a foreign state raise interesting questions concerning the appropriate test to apply in analyzing such claims, questions that courts have yet to definitively resolve.[32] *See Lewis v. Mutond*, 918 F.3d 142, 146 (D.C. Cir.

---

[32] For example, we have yet to decide whether we should adhere to the U.S. Department of State's policy of granting immunity to foreign officials for any actions taken in their official capacity, or whether we should follow the more restrictive test set forth in the Restatement (Second) of The Foreign Relations Law of the United States § 66(f), which favors immunity for any acts a "public minister, official, or agent" of a foreign state "performed in his official capacity" if "the effect of exercising jurisdiction would be to enforce a rule of law against the state." *Broidy Cap. Mgmt. LLC v. Muzin*, No. 19-CV-0150 (DLF), 2020 WL 1536350, at *5-6 (D.D.C. Mar. 31, 2020), *aff'd*, 12 F.4th 789 (D.C. Cir. 2021). Given the important role the executive branch plays in the realm of foreign affairs, *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983), we are inclined to think that the executive's view of immunity is due more deference than the

2019) (applying a legal framework for immunity agreed on by the parties "without deciding the issue" of what standard should govern). The lack of personal jurisdiction over the Crown Princes, meanwhile, is clear under established law, so dismissing the claims against them was appropriate.[33]

A court may exercise personal jurisdiction over a defendant in a civil case only if it has the authority to do so from a source of positive law (such as a statute or a rule of civil procedure) and if exercising jurisdiction would not violate "the outer limits" set by the Due Process Clauses of the Fifth and Fourteenth Amendments. *Fischer v. Fed. Express Corp.*, 42 F.4th 366, 380-83 (3d Cir. 2022). Federal Rule of Civil Procedure 4(k)(1)(A) authorizes the exercise of personal jurisdiction over a defendant who has been served with process

___

Second Restatement's, but we do not need to decide that question now.

[33] Both Crown Princes have preserved the issue. The current Crown Prince raised it in the District Court, although the Court did not rule on it. The former Crown Prince did not make the argument there, but he did not have the opportunity to file a responsive pleading or do anything other than enter a notice of appearance of counsel in the short time between when he appeared and when the District Court dismissed the claims against him. His assertion of a lack of personal jurisdiction for the first time before us is timely. *See Blessing v. Chandrasekhar*, 988 F.3d 889, 899 (6th Cir. 2021) (holding that filing a notice of appearance "does not on its own constitute waiver" of a personal-jurisdiction defense and that a defendant does not lose the argument unless he fails to assert it in his first responsive pleading).

if the defendant "is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located[.]" Federal courts thus "ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). Aldossari brought suit in the U.S. District Court for the Eastern District of Pennsylvania, so we look to Pennsylvania's long-arm statute, which permits the exercise of jurisdiction "to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States." 42 Pa. Cons. Stat. § 5322(b). The statutory inquiry in this case thus merges with the constitutional one.

A defendant may be subject to suit consistent with the constitutional guarantee of due process only if he has "certain minimum contacts with the State such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011) (cleaned up) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Personal jurisdiction can either be general or specific, *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007), but Aldossari fails to establish that the exercise of either type of jurisdiction is appropriate here.

General (or "all-purpose") jurisdiction permits a court to hear any and all claims against a defendant brought within a certain forum, even if those claims have nothing to do with any actions the defendant took in the forum. *Goodyear*, 564 U.S. at 919. The paradigmatic forum for the exercise of general jurisdiction "is the individual's domicile[,]" *id.* at 924, which, for both Crown Princes, is Saudi Arabia.

37

Aldossari nonetheless asserts that the current Crown Prince is subject to general jurisdiction due to his "extensive contacts with the United States[,]" both in his capacity as Crown Prince and on behalf of Saudi Aramco.[34] (Reply Br. at 12-13.) It appears that Aldossari is invoking the standard for permitting general jurisdiction over corporations, which is appropriate in a forum with which the defendant has such "continuous and systematic" contacts "as to render [the defendant] essentially at home in the forum State." *Goodyear*, 564 U.S. at 919. He cites no authority for the assertion that a natural person who is a citizen of a foreign nation and residing there can be subject to general jurisdiction in the United States under *Goodyear*.[35] Taking that framework as applicable, however, the current Crown Prince's contacts with the United States – which, on this record, comprise vague allegations from Aldossari and the Crown Prince's admission that he has sometimes engaged in diplomacy with U.S. government officials – still fall well short of the necessary showing. General jurisdiction requires demonstrably more in the way of continuous and systematic contacts. *Cf. BNSF Ry. Co. v.*

---

[34] Aldossari does not invoke general jurisdiction as to the former Crown Prince.

[35] He might have pointed us to *Waldman v. Palestine Liberation Org.*, in which the court noted that the "at home" standard for general jurisdiction over corporations "was based on an analogy to general jurisdiction over individuals" and remarked that "there is no reason to invent a different test for general personal jurisdiction depending on whether the defendant is an individual, a corporation, or another entity." 835 F.3d 317, 332 (2d Cir. 2016).

*Tyrrell*, 137 S. Ct. 1549, 1554, 1559 (2017) (general jurisdiction inappropriate over out-of-state corporation, even though it had "over 2,000 miles of railroad track[,]" a facility, and more than 2,000 employees in the forum state).

Nor do Aldossari's specific jurisdiction arguments avail him. That form of personal jurisdiction is "case-specific[,]" *Goodyear*, 564 U.S. at 927, and may be exercised if a plaintiff's claims "arise out of or relate to the defendant's contacts with the forum[,]" *Fischer*, 42 F.4th at 372 (quoting *Bristol-Myers Squibb Co. v. Superior Ct.*, 137 S. Ct. 1773, 1780 (2017)). Put otherwise, "the defendant's suit-related conduct must create a substantial connection with the forum State[,]" giving rise to a "relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 283-84 (2014).

No such relationship connects the Crown Princes or their alleged conduct underlying this case to Pennsylvania. The complaint accuses the current Crown Prince of only a few acts: ordering the arrest of the former Crown Prince and the seizure of his assets and preventing him from performing under the Ownership Agreement. That conduct, if it took place, occurred in Saudi Arabia and bore no connection to Pennsylvania. Nothing in the record reveals any "contacts with the forum" by the current Crown Prince, much less any contacts related to the allegations in this case.[36] *Bristol-Myers*

---

[36] In his briefing, Aldossari attempts to impute Saudi Aramco's worldwide oil operations, including those in the United States, to the current Crown Prince, who he says is Supreme Chairman of the company. As discussed previously, however, none of those commercial activities bears any

*Squibb*, 137 S. Ct. at 1780. The complaint is plainly inadequate to permit the exercise of personal jurisdiction over the current Crown Prince.

And as for the former Crown Prince, all of the conduct in which he was allegedly involved – the execution and performance of the Ownership Agreement, and the much later meeting with Aldossari – took place in Saudi Arabia, Saint Lucia, or London. Even if we were to assume, as Aldossari claims, that the former Crown Prince was personally a party to the oil refinery deal,[37] the contract was signed in Saudi Arabia

---

relationship to the transactions at the core of this case, *see supra* Section II.B.2, and so they cannot serve as grounds for specific jurisdiction. And Saudi Aramco's business dealings in the United States, at least as conclusorily alleged here, are not sufficient to make it so "essentially at home" here as to justify the exercise of general jurisdiction. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). So even if the company's contacts could be attributed to the Crown Prince – which we doubt – they would not suffice to establish jurisdiction over him.

[37] That assumption appears dubious. Although we take Aldossari's allegations as true, they must give way to contrary evidence in the Ownership Agreement attached to the complaint. *See Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 112 (3d Cir. 2018) (when a plaintiff's "own exhibits contradict [his] allegations in the complaint, the exhibits control"). That contract's lists of parties and ownership percentages and discussion of responsibilities all mention Saudi Est., but not the former Crown Prince. By contrast, "[t]he Owner of Saudi Est." (J.A. at 102) – who

and concerned the use of Saudi oil in a refinery in Saint Lucia. It is not alleged that any aspect of the project was connected to the forum state of Pennsylvania.

Aldossari argues that the former Crown Prince can still be subject to personal jurisdiction in Pennsylvania because the Ownership Agreement had as counterparties Ripp, a Pennsylvania citizen, and Transcontinental, a Delaware corporation. That position, however, is squarely foreclosed by precedent. Merely entering into a contract with a resident of a state, absent any indication that the contract was executed or performed there, is insufficient to justify the exercise of personal jurisdiction in that state. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985) ("If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot."); *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 621-22 (1st Cir. 2001) (no personal jurisdiction when "the business relationship between" foreign defendant and domestic counterparty "involve[d] no in-forum activities[,]" since defendant's "business relationship and/or contract with [domestic counterparty] … is not *itself* a contact with the United States as a forum"). Because none of the former Crown Prince's conduct related to this litigation had a "substantial connection with the forum State[,]" *Walden*, 571 U.S. at 284, the District Court lacked personal jurisdiction over him.

---

Aldossari claims was the former Crown Prince – is only mentioned in passing as entitled to a seat on the refinery's board.

41

As a last resort, Aldossari tries to salvage his claims against the Crown Princes by arguing, as he did in the District Court, that he should be afforded jurisdictional discovery before his claims are dismissed. To be sure, "[a] plaintiff faced with a motion to dismiss for lack of personal jurisdiction is entitled to reasonable discovery[.]" *Second Amend. Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 525 (D.C. Cir. 2001) (alterations in original). But that right is not unconditional. A plaintiff cannot show up in court with "bare allegations" and force defendants to start handing over evidence. *Eurofins Pharma US Holdings v. BioAlliance Pharma SA*, 623 F.3d 147, 157 (3d Cir. 2010). Rather, jurisdictional discovery is appropriate when "the plaintiff presents factual allegations that suggest 'with reasonable particularity' the possible existence of the requisite 'contacts between [the party] and the forum state[.]'" *Id.* (citation omitted) (first alteration in original).

Here, Aldossari's bare allegations do not give us any reason to think that, with more evidence, he could identify some conduct by the Crown Princes that connects them to Pennsylvania, much less link that conduct to the allegations that underlie his claims. Moreover, Aldossari has not pointed to any specific facts he might be able to discover that would support the exercise of personal jurisdiction. That being so, letting him take discovery would be the launch of a "fishing expedition[,]" which we decline to facilitate. *Id.* Because no personal jurisdiction exists over the current and former Crown Princes, the District Court's dismissal of the claims against them was warranted.

### D. Ripp: Subject-Matter Jurisdiction and Appellate Rule 43

Ripp participated pro se in the District Court proceedings and moved to dismiss on standing, venue, and merits grounds, prevailing on the first of those bases. Three months after Aldossari filed his notice of appeal, however, Ripp died. Aldossari's briefing did not specifically address the District Court's dismissal of his claims against Ripp or take a clear position on whether he intended to continue pursuing those claims. That alone could be a forfeiture. At argument, however, his counsel took the position that Aldossari still wishes to pursue those claims. Counsel also asserted that no estate has been opened for Ripp.

Even if there were an estate, though, Aldossari's effort to pursue a claim would run into an early roadblock: the absence of legal authority to exercise subject-matter jurisdiction over his claims against Ripp. This is an issue we have "an independent obligation" to consider of our own accord. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 501 (2006). The sole basis for jurisdiction identified in the complaint is the FSIA, which – in addition to failing to permit the exercise of jurisdiction over the claims against any of the other defendants in this case, *see supra* Section II.B – is obviously inapplicable to the claims against Ripp, who was a natural person domiciled in the United States. *See* 28 U.S.C. § 1330(a) (granting district courts with jurisdiction over claims against "foreign state[s]"). But Aldossari, as the party asserting the existence of federal jurisdiction, had the burden of alleging a legal basis for exercising such jurisdiction. *Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105-06 (3d Cir. 2015); *see also* Fed. R. Civ. P. 8(a)(1) (requiring a plaintiff to set out "a short and plain

statement of the grounds for the court's jurisdiction"). He has not done so for his claims against Ripp, nor is a basis for jurisdiction evident on this record. Dismissal of those claims was therefore appropriate. *See Williams v. Marinelli*, 987 F.3d 188, 196 (2d Cir. 2021) (noting the "inflexible" rule that a court must, "of its own motion," order dismissal "in all cases where … jurisdiction does not affirmatively appear on the record" (quoting *Mansfield, C. & L.M. Ry. Co. v. Swan*, 111 U.S. 379, 382 (1884)); *cf. United States v. Yeager*, 303 F.3d 661, 666 (6th Cir. 2002) (dismissing appeal because appellant "fail[ed] to identify a viable statutory basis for this Court's appellate jurisdiction").

Assuming we had subject-matter jurisdiction over the claims against Ripp, however, we would still dismiss the appeal against him on another threshold basis: Ripp has not been replaced in this appeal by any person or entity that can represent his interests. When a party dies during the pendency of an appeal, "the decedent's personal representative may be substituted as a party on motion filed with the circuit clerk by the representative or by any party." Fed. R. App. P. 43(a)(1). If there is no representative, we may "direct appropriate proceedings" once a party has "suggest[ed] the death on the record[.]" *Id.*

Appellate Rule 43 offers no guidance on what those "appropriate proceedings" may be, in contrast to the analogous civil rule for district-court proceedings, which provides that "the action by or against the decedent must be dismissed" if no one moves to substitute a party within ninety days of the death being stated on the record. Fed. R. Civ. P. 25(a)(1). Even so, several of our fellow circuits have interpreted Appellate Rule 43 to permit dismissing the claims involving the decedent

44

when no representative has been substituted within a reasonable time period. *See Gamble v. Thomas*, 655 F.2d 568, 569 (5th Cir. Unit A 1981) ("deem[ing] that Rule 43(a) implies the power" to dismiss an appeal "if no motion for substitution is made within a reasonable period" because it is "derived from [Civil Rule] 25(a)"); *Johnson v. Morgenthau*, 160 F.3d 897, 898-99 (2d Cir. 1998) (holding that "best course" was to dismiss appeal when no representative had come forward); *cf. Deibel v. Hoeg*, 998 F.3d 768, 768 n.* (7th Cir. 2021) (admonishing parties that a deceased defendant-appellee would be "dismiss[ed] … as a party" "[u]nless within ten days [appellant] files an appropriate motion for substitution"). That conclusion is consistent with the advisory committee's note to Rule 43(a), which characterizes the Rule as laying out "a procedure similar to the rule on substitution in civil actions in the district court."

Several of our fellow courts have taken a different approach in applying Appellate Rule 43, going ahead and ruling on the issues presented in the appeal as if no death had occurred. *See, e.g.*, *Ciccone v. Sec'y of Dep't of Health & Hum. Servs.*, 861 F.2d 14, 15 n.1 (2d Cir. 1988) ("[A]lthough no motion for substitution has been filed in this Court, we may proceed to decide [decedent]'s appeal." (citation omitted)); *Hardie v. Cotter & Co.*, 849 F.2d 1097, 1098 n.2 (8th Cir. 1988) ("While a personal representative has yet to be substituted as a party in this action, we find it appropriate to dispose of [decedent]'s claims in this opinion."); *Wright v. Com. Union Ins. Co.*, 818 F.2d 832, 834 n.1 (11th Cir. 1987) (same). But in all those cases the decedent was the plaintiff-appellant, and the defendant-appellee had no incentive to proactively go out and find a representative to take over the task of advancing a case against itself. Nor was it under any

45

obligation to do so, as defendants generally have no duty to take affirmative measures to move a case forward when the plaintiff has failed to pursue it in a timely manner. *See Dodson v. Runyon*, 86 F.3d 37, 41 (2d Cir. 1996) (noting that defendants are not "under any duty to take any steps to bring [a] case to trial"). In such circumstances, the best use of judicial resources may be to decide the merits of the appeal and grant the defendant-appellees a resolution of the case.

The calculus looks different when it is a plaintiff-appellant who wishes to proceed with an appeal upon the death of a defendant-appellee. After all, it is the plaintiff who bears the burden of diligently prosecuting his case. *Cf.* Fed. R. Civ. P. 41(b) (permitting dismissal of an action when a plaintiff "fails to prosecute"). And that responsibility follows him if he takes an appeal of a case-dispositive order. *United States v. Turner*, 438 F.3d 67, 71 (1st Cir. 2006) ("[A]s the appellant, he bore the burden to utilize all reasonable measures to prosecute his appeal."). It is appropriate, then, to place the onus on the plaintiff-appellant to timely identify a person (such as a legal representative or the trustee, administrator, or executor of the decedent's estate) or an entity (such as an estate or a trust) that can be substituted for the decedent and that can defend the decedent's interests. Without someone or something on the other side of the "v." in the caption, the plaintiff's claims are pointless and dismissal of the appeal is warranted.

That is the situation here. Aldossari's counsel asserted at argument that no estate had been opened for Ripp, and he was unable to say that one would ever be opened. The mere possibility that there may someday be a substitute party that

46

Aldossari can bring to court is not enough to justify expending judicial resources on entertaining a one-sided cause of action.[38]

### E.    Disposition

As we have explained, we agree with the District Court that dismissal of all of Aldossari's claims was warranted. We are unable to affirm its order of dismissal, however, because the Court erred in dismissing the complaint with prejudice. "A dismissal with prejudice 'operates as an adjudication on the merits'" and typically prevents the plaintiff from subsequently litigating his claims in either the original court or any other forum. *Papera v. Pa. Quarried Bluestone Co.*, 948 F.3d 607, 610-11 (3d Cir. 2020). "Dismissal for lack of standing[,]" by contrast, "reflects a lack of jurisdiction" rather than a view on the merits, "so dismissal of [Aldossari's] complaint should have been without prejudice." *Thorne v. Pep Boys Manny Moe & Jack Inc.*, 980 F.3d 879, 896 (3d Cir. 2020). Similarly, the grounds for our holding that the complaint was correctly dismissed are all "threshold, nonmerits issue[s]" that do not require us to "assum[e] … substantive 'law-declaring power.'" *Sinochem Int'l Co.*, 549 U.S. at 433. Neither our opinion nor

---

[38] We have previously indicated in dicta that, "[r]egardless of whether [a party] has failed to comply with Rule 43(a), we think it is quite clear that, at some point, the failure to substitute a proper party for a deceased appellant moots the case" and deprives us of jurisdiction. *Ortiz v. Dodge*, 126 F.3d 545, 550-51 (3d Cir. 1997). Because we resolve the appeal against Ripp on subject-matter jurisdiction and Rule 43 grounds, we need not consider whether the claims against Ripp have become moot in the constitutional sense.

the District Court's reflects a view on the merits that would have claim-preclusive effects, so the dismissal must be without prejudice. *Papera*, 948 F.3d at 611.

It appears that the District Court's intent was to make its order final and therefore appealable, once Aldossari had elected to stand on his complaint rather than seek to amend it. *See Weber v. McGrogan*, 939 F.3d 232, 238 (3d Cir. 2019) ("[W]hen a plaintiff prefers not to amend, he 'may file an appropriate notice with the district court asserting his intent to stand on the complaint,'" at which point the court can issue an order making its dismissal final and allow the plaintiff to take an appeal.). But making an order dismissing a case final – ending the litigation in the district court and enabling the plaintiff to trigger our appellate jurisdiction, 28 U.S.C. § 1291 – is not the same as making the dismissal with prejudice, which ends the district-court litigation *and* amounts to a rejection of the plaintiff's claims on the merits that has preclusive effect on future suits. Consistent with that distinction, it is necessary here to vacate and remand for the limited purpose of allowing the District Court to modify its dismissal order to be without prejudice.

## III.  CONCLUSION

For the foregoing reasons, we will vacate the District Court's dismissal with prejudice and remand with directions to dismiss the complaint without prejudice.